BARNARDS *v.* THE STATE.

(*Knoxville.*    October  26,  1889.)

1. MURDER.    *Sufficiency of evidence.*

Upon the facts stated and fully discussed in this opinion the jury found verdict of guilty of murder in first degree, perpetrated while lying in wait; and the Circuit Judge approved that verdict and passed sentence of death upon the five defendants; and the Supreme Court, after "a most solicitous and painstaking consideration," approved and affirmed the judgment of the lower Court, the Chief Justice dissenting.

2. CRIMINAL PRACTICE.    *Disposition of motion for new trial.*

Defendants, in a capital case, entered motion for new trial, which was set for hearing on next morning.  At time appointed for argument of motion defendants asked further delay.  This was refused, unless good cause was shown by affidavit.  Defendants then asked an hour's time to prepare affidavit.  This was likewise refused, unless some grounds were stated in support of this application.  The defendants, failing to state any grounds for the delay asked for preparation of affidavit, or any reasons for postponement of the argument of the motion, the Court heard and overruled the motion for new trial.
*Held:* Not error.

3. SELF-DEFENSE.    *Charge of Court.    Fear or apprehension of danger.*

Charge of Court does not restrict the exercise of the right of self-defense to the existence of *actual* danger, nor exclude the exercise of that right where the danger is *apparent* upon reasonable grounds, where the language used is: "Self-defense, therefore, rests upon necessity, actual or *apparent*.  A common assault, not actually or *apparently* endangering life or great bodily harm, will not excuse a homicide in repelling it.  But to excuse a homicide the danger of death or great bodily harm must be real, or *honestly believed to be so,* and *on reasonable grounds.*  The danger must be *apparent* and imminent, and existing at the time of the fatal injury, or *honestly believed to be so, and on reasonable grounds.*  The belief or apprehension of danger must be founded on *sufficient circumstances to authorize the opinion* that the purpose to kill or do great bodily harm then exists, and the fear that it will at that time be executed."  This language is substantially that of the Rippy case.

Barnards *v.* The State.·

Cases cited and approved: Rippy *v.* State, 2 Head, 218; Williams *v.* State, 3 Heis., 394; Draper *v.* State, 4 Bax., 252; Jackson *v.* State, 6 Bax., 457.; Allsup *v.* State, 5 Lea, 369; Hull *v.* State, 6 Lea, 256.

4. SAME. *Same.* " *Well-founded*" *or* " *well-grounded*" *apprehension.*

Nor is there any error in the use of the words "well-founded" and "well-grounded" in the charge, in connection with the language quoted above, as descriptive of the fear, belief, and apprehension under which a fatal blow in self-defense must be struck.

Case cited and approved: Rippy *v.* State, 2 Head, 221.

5. SAME.· *Same.* *Overt act.*

Charge of Court, as to the overt act requisite in cases of self-defense, is correct in this language: "Previous threats made by the deceased against defendant will not, of themselves, excuse the defendant in killing the deceased; *but there must be some overt act or words at the time, clearly indicative of a present purpose to do the threatened injury.*" This is substantially the language of the Rippy case. The doctrine of that case has been often repeated and approved by this Court. There has not been any departure from it hitherto, and no reason exists for such departure now.

Cases cited and approved: Rippy *v.* State, 2 Head, 221; Williams *v.* State, 3 Heis., 394; Draper *v.* State, 4 Bax., 251; Hull *v.* State, 6 Lea, 256; Allsup *v.* State, 5 Lea, 369; Jackson *v.* State, 6 Bax., 457.

6. CRIMINAL LAW. *Charge as to circumstantial evidence not requisite, when.*

Except in cases, where the defendant's guilt depends wholly and alone upon circumstantial evidence, it is not requisite that the Court should give, in addition to the charge as to reasonable doubt, the usual instructions as to circumstantial evidence. The facts of this case did not call for any charge upon the subject of circumstantial evidence.

Cases cited and distinguished: Smith *v.* State, 2 Leg. R., 56; Turner *v.* State, 4 Lea, 207.

FROM HANCOCK.

Appeal in error from Circuit Court of Hancock County. A. J. BROWN, J.

J. T. & J. K. SHIELDS, W. P. GILLENWATERS, F. M. FULKERSON, L. M. JARVIS, COLEMAN & COLEMAN, and McH. Ross for Barnards.

H. T. CAMPBELL, District Attorney-general, KYLE & McDERMOTT, DAVIS & DRINNEN, GRANT JARVIS, S. WILLIAMS, A. J. TYLER, INGERSOLL & PEYTON, and Attorney-general PICKLE for State.

CALDWELL, J.   There is very much of human life involved in this case.   The plaintiffs in error are under sentence of death for the murder of Henly Sutton, having been convicted in the Circuit Court of Hancock County.   There are five of them: John (known as "Big John"), Anderson, and Elisha Barnard, who are brothers, and their cousins, John (called "Little John") and Clint, who are also brothers.   They have appealed in error to this Court, and through eminent counsel seek a reversal and new trial.

Of the many reasons urged for a new trial, we consider first the contention that *the verdict is not sustained by the evidence.*

That the prisoners, or one of them rather, took the life of Sutton, is not by them disputed; but it is boldly asserted by them in their evidence, and strongly urged by their counsel in argument, that it was done *in self-defense.*

The State's theory of the homicide is that it was deliberately planned, and *perpetrated while lying in wait.*

The deceased is shown to have been a violent and dangerous man when his passions were aroused, though he was not a quarrelsome or "fussy" man, as some of the witnesses say. It was his habit to go armed, and, when killed, he had both a gun and a pistol, the former in his hand and the latter upon his person.

The character of the prisoners for peace and quietude is not shown further than it appears from their conduct in this case, and from their own testimony that they had serious difficulties with "the Furgersons" twelve months, and with "the Wincklers" six months, before the death of Sutton, in which two difficulties they say "shooting was on both sides;" and since the latter of which they have habitually carried repeating Winchester rifles, as they themselves testify.

The first fact or circumstance presented in this record as an indication of unfriendliness between Sutton and any of the prisoners, is detailed by "Big John" himself, as follows: "I was out hunting one night; had a light, and somebody shot at me. I did not know then who it was, but have since learned that it was Sutton. I heard the balls strike, and threw down my light. * * * It was five or six years ago that we were shot at while hunting."

Noah Sutton, who was with "Big John" on the occasion just mentioned, says that they were out hunting, "and while in the woods, near Henly Sutton's, some one fired three shots, I supposed

at us.   *   *   *   We went back next morning and examined, but could find no sign of the bullets."

Tillman Sutton, who, as well as the last witness, was introduced by the prisoners, gives this account of the matter, namely: "I am a son of Henly Sutton, deceased. Some six years ago we heard some one hallooing and cutting up, and father and I went out to where we could see, something near one-fourth of a mile from the house, and saw two boys with a light.   *   *   * Father shot twice, but not in the direction of John Barnard and Noah Sutton. He fired the shots down the bottom."

For the purpose of showing subsequently existing and continuing ill-will on the part of Sutton, the defense introduced Noah Mills, a kinsman of all parties, who testified that, while at Sutton's still-house about three years before the trial, Sutton picked up a big pistol and said if "Big John" Barnard did not "quit fooling 'round there he would empty it into him."

The witness makes no explanation of this threat, and gives no reason for it. None is shown in any part of the record, nor does it appear that the threat was ever communicated.

The firing of the shots in the night-time is sufficiently explained by the quotations given, which make it apparent that the deceased intended only to frighten the hunters away, and not to harm them.

At any rate, it is evident that neither of the scenes thus far mentioned played any part in the tragedy, ending in the death of Sutton, years thereafter. The facts leading up to and causing the homicide were of more recent origin. It is a well-established, and indeed a conceded fact, known to many of their friends and neighbors, that Henly Sutton and some of the defendants were on unfriendly terms for weeks, and perhaps months, before he was killed. Some time before his death (exactly how long is not disclosed) Sutton became greatly enraged on account of cruel injuries secretly done to his hogs. At different times and to different persons he charged "Big John" and "Little John" Barnard with the offense, and expressed a firm purpose to hold them to a personal account.

To show their exact character, we give his accusations and threats somewhat in detail, and substantially in the language of the witnesses. George Barnard, an uncle of the defendants, says: "I had a talk with Sutton about the hog matter. He accused 'Big John' and Vina's John [Little John] of cutting his hogs. They denied it. I talked to Sutton to try to get the matter settled. Sutton said he did not fear living man, and if they got at it the river would not be between them."

Anderson Barnard, a son of George Barnard, says: "Sutton told me that 'Big John' and Vina's John had cut his hogs, and that a man could not do him that way and live."

Jesse Jordan states: "A few days before July 4 Sutton told him it would not do for him and 'Big John' to meet."

William Cook testified that Sutton told him "Big John" Barnard cut his hogs, "and he would kill him for it."

These threats, or most of them, are shown to have been communicated.

"Little John" and Elisha say, that a short time before the death of Sutton, they were passing his house with a loaded wagon; that he saw them, and, taking Elisha to be "Big John," came out to the road "with gun and pistol, and said, 'Hold on there, 'Big John' Barnard, I have a settlement to make with you;'" that, on discovering his mistake, he cursed "Little John" and "Big John," saying that they cut his hogs, and that "all he wanted was to see 'Big John,' the black-hearted rascal, he would settle with him." All this was reported to "Big John" soon after it occurred.

Wiley Cozart claims to have heard Sutton say that "Big John" Barnard had cut his hogs, and that he would kill him for it "at all hazards, and would give any man fifty dollars that would get him on the road between the still-house and George Barnard's; that he had the tools to do it with," at the time exhibiting a Winchester rifle.

Speaking of a different time, Zora Harvey says: "He [Sutton] told me if I would bring 'Big John' Barnard between the still-house and George

Barnard's, where he could kill him, he would give me twenty-five dollars."

The two last alleged statements are not shown to have reached the ears of the defendants before the trial in the Court below. The witnesses making them were impeached upon their general character by one witness each, and sustained by none. On cross-examination the witness impeaching Harvey shows that he does so on insufficient grounds.

Notwithstanding these threats, some of them very violent in their nature, it is not in fact shown, or attempted to be shown, that Sutton ever left his business, or went out of his way at any time, to seek a meeting with the defendants, or any one of them. And it is at least probable that he had changed his mind as to the identity of the perpetrators of the offense complained of, as will appear from facts now to be narrated.

The State's witness, John F. Mills, who was a friend to Sutton and a cousin of the prisoners, makes the following statement: "A few weeks before the killing I was talking with Sutton about the hog cutting, and told him I didn't believe 'Big John' had cut his hogs. He said he had about come to believe that too, and that if 'Big John' would make affidavit that he didn't do it, he would have nothing against him. I told him I would go and see him [Big John] about it. The next day I went to see 'Big John' Barnard to get the difficulty fixed up. Barnard

offered to go and make the affidavit that he did not cut the hogs, and fixed the Saturday following to do so."

In his testimony "Big John" says: "Sutton accused me of cutting his hogs. I did not do it, and offered to go before a Magistrate and file an affidavit that I did not do it."

Touching the same subject, Prior Barnard, "Big John's" father, says: "I knew of John Mills coming to have John go and make the affidavit about not cutting the hogs. I told John not to go to make the affidavit, that it was a plan to get him killed."

The affidavit was not made.

In stating the facts and circumstances leading up to the homicide, and as indicative of his state of mind, it is proper to note that "Big John" Barnard, particularly, became very angry at the charge made against him, and at one time went into Sutton's neighborhood to investigate the report, and perhaps to do more than that.

The State's witness, Clinton Leyer, says that he met the prisoners at his mother's house, one mile from the home of Sutton, in the *forenoon* of the last *Monday* before Christmas, 1888; that four of them were then armed with Winchester rifles; that "Big John" called him to the fence, inquired and complained about the report; seemed to be very "mad," and wanted "to get the matter straightened out."

Thomas Sutton, another witness for the State,

says that he saw four of the defendants, about 10 o'clock in the morning of the same day, some two miles from Sutton's still-house, and *on his nearest road from his residence to his still-house*, it being the same road on which *Sutton did, in fact, pass* Mrs. Leyer's house, going in the direction of his still-house, soon after the defendants left her house; and *it being known to the defendants* that it was the habit of Sutton to go by this road from his residence to his still-house every *Monday morning*.

The same witness further says: "As I came up to them I saw 'Big John' Barnard *going along the fence, apparently about half bent*. He raised up as I came up. They had guns. * * * Some people say that I *resemble Henly Sutton*. He was my cousin."

"Big John" admits that he saw the last two witnesses, at the times and places mentioned by them, but *disclaims any purpose* then to do violence to Sutton, saying, rather, that it was his desire to talk with other persons. The fact was, that he and his companions returned to their homes *that time* without meeting Sutton, or having an adjustment of the matter they had so much at heart, and which had brought them into Sutton's neighborhood, and *upon this particular road*, in the forenoon of *this particular day*.

Defendant Clint Barnard seemed to understand the situation, and to know the state of "Big John's" mind, when he said to Clinton Leyer, at

one time, that " he believed if Sutton and ' Big John' ever met, one of them would be killed." Such seems also to have been the apprehension of others who knew both men, some fearing they would meet, as they, in fact, came near doing on the very Monday morning just mentioned.

Sutton owned and operated a licensed distillery on the *north* side of Clinch River, in Hancock County, and resided three and a half miles away, on the same side of the river. It was his *known custom* to spend Sunday at home with his family, going to his distillery *Monday morning* and returning to his home *Saturday evening*. Late in the afternoon of *Saturday*, January 12, 1889, while on his way home by his usual route, and when one mile and a half from his distillery, near a small ravine and in a narrow valley between two hills, he was shot from his horse and instantly killed.

All of the prisoners, except Clint, lived on the *south* side of Clinch River, some five or six miles from the place of the killing, and Clint lived with his mother, Vina Barnard, on the *north* side of the river, about four miles from the fatal spot.

Nearly three weeks. after their fruitless visit into the neighborhood of Sutton's home, on the last Monday before Christmas, they went again into the same neighborhood and *upon the same road* with very different results.

Early in the afternoon of Friday, the day before Sutton met his death, " Big John," Anderson, Elisha, and " Little John," each armed with a re-

13 P

peating Winchester rifle, by previous agreement left their homes, for a purpose to be learned from what afterwards transpired, in connection with facts and circumstances heretofore and hereafter given in this opinion. Reaching the river, which was about three miles from their homes, at dark, these four armed men stealthily took possession of a canoe belonging to a man with whom they had unfriendly relations, and in it crossed over to the other side, quietly and without being seen. They then went and took supper at Vina Barnard's, and when the meal was over, Clint *proposed to join them*, as he did, and the five went together that night, on foot, four miles farther, to the home of their cousin, Anderson Barnard, where they spent the remainder of the night. This cousin resided about *one-half mile* from the place of the homicide, *between it and the distillery* and *one hundred yards from, in sight and hearing of the road*, along which it was Sutton's known habit to pass, on Saturday, when going from his still-house to his home.

*Between daylight and sunup* next morning they left their cousin's home, and went out a short distance into "Troublesome Ridges," a range of hills or ridges *which were situated along and within the curve of the road between Sutton's still-house and the point at which he was killed*. On these ridges, from which *parts* of the road mentioned are *in easy view*, the prisoners quietly spent the day, without dinner, and, as they say, without seeing any one save their said cousin, Anderson, and his

brother, John, whom they met on the hill not far from the place, and not long before the time of the homicide.

When Sutton reached the narrow valley already mentioned, shortly after 4 o'clock in the afternoon of that day, going along the road in the direction of his home, *the defendants were there*, and in the shortest time the fatal work was done by one or more of them.

This narration of what they did and where they went, from the time of leaving their homes until Sutton's death, is taken from *statements made by the defendants themselves* while on the witness-stand. Their explanation of their wanderings is that their uncle, George Barnard, was sick, and had sent word to his brother, Prior Barnard, on Tuesday or Wednesday, and again on Friday, claiming a visit from him; that, because he was not right well himself, Prior asked his son, "Big John," to make the visit for him, which the latter agreed to do, and for that purpose set out, with his two brothers and cousin, "Little John," in the afternoon of the latter day, as before stated. They further say that when they reached the home of their cousin, Anderson, that night, he informed them "that his father [their sick uncle] was better, and that they were crowded, had plenty of company, and that we could stay with him," which they did; that *Clint told them* (the other defendants) that night that he had heard that Mary Lawson, a woman of bad character, was over in "Troublesome Ridges,"

*and suggested* that they should go the next day and "run her off" because his brother William had been neglecting his family on her account; that they went into the ridges accordingly the next morning, "intending to go to Uncle George's that night;" that they failed to find Mary Lawson, and were returning that evening when they met their Cousin John (George's son), "hunting a squirrel" for his sick father; that John told them his brother Anderson, with whom they spent the night before, "was over the hill fixing a fence," whereupon they went to Anderson, who was on the hill-side, about one hundred yards from the point at which Sutton was killed shortly thereafter.

Their Uncle George, whom the defendants claim to have started out to visit in the first instance, lived on the road so often mentioned hereinbefore, about one-half mile from the scene of the homicide, back in the direction of Sutton's still-house, in sight of and about one hundred yards from the house of his son Anderson.

George Barnard and others show that he was, in fact, sick at this time; and Samuel Davis says he communicated the fact to Prior Barnard on Friday before the homicide. Prior Barnard states that he received the information from Davis, and thereafter requested his son, "Big John," to go to see his sick brother for him; and Anderson, a son of George, says that he induced the defendants to spend Friday night at his house by the state-

ment that his father was better and had plenty of company for the night.

To this extent the explanation of the defendants is corroborated. But why *so many* of .them should have gone on this friendly mission at the same time, *four of them heavily armed,* is not · satisfactorily explained by the defendants themselves, nor anyone else. Nor is it natural that they should have gone away from their cousin's house the next ·morning, and wandered in the hills all day without calling ' to see their sick uncle, who lived *only one hundred yards* from the place where they spent the night, if a visit to him was the *prime object* of their coming into the neighborhood.

The mission was so pressing that they must travel several miles in the night-time, and on foot; yet, when a new day dawned upon them, *in sight and hearing of their sick kinsman's house,* without calling *even a moment* to assure him of their own interest in him, or to deliver a message of sympathy from an affectionate brother, who had sent them, they go out upon the hills, ' *whose tops command successive views of the road upon which their victim was soon to travel.* Would it not have been more natural—if their contention is the correct one—for the defendants to have visited their uncle at the first opportunity on Saturday morning, and then, with all reasonable expedition, have carried the good tidings of his improved condition to his brother, Prior, who had inspired the brief journey,

and who was miles away in the midst of concern and anxiety?

There is much conflict in the testimony with respect to the immediate facts of Sutton's death. The first and leading witness for the State was John F. Mills, who, as has already been seen, was a cousin of the defendants and a personal friend of the deceased. He was "store - keeper and gauger" at Sutton's distillery. He says: "Sutton's custom was to leave his distillery for home Saturday evening and return Monday morning, and I usually went to and fro with him. On Saturday, January 12, about 4 o'clock P.M., we left. I left the still-house with Sutton, on horseback, * * going in the direction of Sutton's house, and he said he had started home. We had got one and one-half miles, and were riding along side by side, some four or five feet apart, he on my left side, when I heard a gun fire. My horse jumped, and I looked back, supposing Sutton's gun had fired, and saw Sutton falling to the ground from his horse. He was just about straight on the ground. I then looked down the road in the direction we were going and *saw smoke rising about four feet above and over a log* that lay at right-angles to the road on the left, and between two beech trees that stood on the side of the log next to me; and then I saw 'Big John' Barnard, one of the defendants, *coming from the end of the log* next to the road and crossing the road to the right side from me; and saw Anderson Barnard, one of the

defendants, coming toward us *from the direction of the log and beeches* on the left of the road; and saw a boy, named Elbert Leedy, who was just ahead of us, some two hundred and fifty or three hundred yards beyond the log in the road, and looked like he had stopped his horse, standing angling across the road; and then saw 'Little John' Barnard and Anderson [Elisha?] Barnard, defendants, coming around the side of the hill to my left *from the direction of the root of the log.* When 'Big John' was at a mossy bank on right side of the road, and about thirty feet from where I saw the smoke, he shot the second time, and then advanced in the direction of Sutton and kept shooting, and, I think, shot in all four or five times, the last shot being fired when within about thirty steps of Sutton, who was lying on the ground. I saw Anderson Barnard shoot one shot. He was in front of the log about fifteen feet. I did not know any of the defendants were there, nor saw none of them until the first shot was fired. From where Sutton was when the first shot was fired to where I saw the smoke the distance is about seventy yards, I should guess. I did not see Sutton make any pass to shoot. I saw only four of the defendants: John Barnard, Anderson Barnard, and Elisha Barnard, sons of Prior Barnard, and John Barnard, son of Vina Barnard, and all four had guns I thought to be Winchester rifles. When the shooting was over, 'Big John' and Anderson came up to where I

was, and I said to them, looking at Sutton, 'What a pity;' and John said, yes, it was a pity, but his life was as sweet to him as Sutton's, and said he had to do what he had done in self-defense; and Anderson then asked me if I did not see Sutton bring his gun up. I told him I did not—was not looking at him at the time. 'Big John' seemed to be crying, as I saw him take out his handkerchief and wipe his eyes with it. While standing there, Elisha and 'Little John' came down off of the left-hand hill to where we were. I told them there would have to be something done with Sutton, and I would go and get some one to come and see to him; but was afraid the hogs would get to him, and they agreed to stay, and I got on Sutton's horse, led mine, and started, leaving them there. * * * I afterwards examined the log, and am of opinion the log is thirty feet or more long, probably thirty inches in diameter at small end; had fell across the road and had been cut out for wagons to pass, and in falling turned up by the roots at the foot of the hill. The log bows up and is off of the ground. I saw some limbs which looked like they had been fixed *for a rest*, one limb lying at right-angles with the log, and the other with one end on that limb and parallel with the log. * * * I saw 'Big John' and the smoke about the same time. He was *coming from the end of the log* and crossing the branch and road to my right. When I first saw him he was about fifte

or twenty feet from the smoke. He was holding his gun in a shooting position when he crossed the road to the right, angling toward us. As he crossed the road with his gun in shooting position I thought he had his gun pointed toward me, and I told him not to shoot me, and he said ' Get out of the way!' and I did so; and when he reached a mossy bank on the right side of the road he fired at Sutton lying on the ground, which was the first shot I saw fired. * * * After 'Big John' fired the shot at the mossy bank I saw defendant, Anderson Barnard, fire a shot at Sutton as he lay on the ground. * * * The rest under the log was near the first beech. I afterwards lay down at the rest, and could plainly see the body of a man on horseback who was placed in the position where Sutton was when he was shot. I could see from the breast up."

Mills further says that Sutton was armed with a Winchester rifle and a 44-caliber Smith & Wesson pistol at the time he was killed, and that he was accustomed to go armed in this way; that when he "last noticed Sutton before the shooting he was carrying his gun in his right-hand and across his right thigh."

The next witness called by the State was Elbert Leedy, the same person seen by Mills on horseback beyond the log, and the same seen and mentioned by all the defendants. He says: "I had been to Sutton's still-house on the day of the killing, and left there about 4 o'clock and started

home on the road the killing was done on. I was riding fast to get home to go to meeting that night. When I had passed the log some two or three hundred yards I heard a shot fired behind me, and *immediately turned my horse* across the road to the left and looked back, and saw four men—John Mills and three others. When I first saw them, one was *near the end of the log* on the right-hand side of the road as I looked back —that is my right-hand—and crossed the road and went in the direction from me and shot several times. I saw him shoot after he got across the road. I could see him hold out his gun and see the smoke. He was shooting up the hollow. I could see the end of the log at the road on my right, and could not see the roots of it. I then went on home. The hollow from foot of one hill to the other is about fifty yards wide. I was riding in a fast trot when I passed the log. The men I saw were near the beech trees.    *    *    * When I first turned around after hearing the shot *the three men were between me and the log.*    *    * The road I was traveling entered the woods just about where the log lay, and ran through a wooded hollow for several hundred yards.    *    *    * I was riding a gray horse six years old, and had good eyes. I saw no one at the log as I went down. I think I would have seen them if they had been there, and especially if standing up, and I had been looking that way. There was no obstruction to hinder me from seeing them if they

had been there, and I had looked that way. I was looking down the road. * * * I saw one of the men on a mossy bank on the left of the road from me, and heard and saw him shoot. *He walked from the end of the log.*"

Marion Lewis, who was attracted to the scene by the report of the firing, and who noticed the defendants going away as he approached the dead body of Sutton, testifies: "Four of us made an examination of the log. A foot-path crosses over the log near the roots. Saw a limb lying upon another limb, looked like it had been fixed for a rest at a place where it lay off of the ground about eighteen inches, and near the middle of the log. One large limb lay on the ground at right-angles to the log. Another smaller one, about the size of my leg, lay under and parallel to the log, with one end lying on the large limb and the other on the ground. I saw fresh dirt on the under side of it as if it had recently [been] picked up off of the ground and laid there. I saw, in four different places by the log, signs which looked like signs of men; looked like men had tramped around, but saw no whole tracks. It looked as though the leaves and dirt were moved and tramped down. * * * The first sign was near the root of the log, and looked like where a person had stood and tramped and patted the ground down with his feet. The next was at the rest I have described, some ten or twelve feet farther down the log, near its center. I saw here

signs of where it looked [like] a person had laid down. The earth and leaves were pressed down at the smaller limb under the log, and further back were the fresh prints, looked like of a man's boots or shoes. The third sign was between the rest and the first beech tree, and near the first beech. The ground was tramped, and looked like it had been patted down with feet. I saw the half prints of boots or shoes, but the ground was patted down so that I couldn't distinguish whole tracks. The fourth sign was at the beeches, or at the log near the beech next to the road, and was like the last I have described. There was a large hole in the ground where the roots of the tree had torn up, and the roots were wide-spreading. Men could have been there and not have been seen from road. * * * A man could not be seen from supposed rest on a horse at Sutton's feet, but don't know how it would be at hips. This was all the experiment I made. I looked from limb under log."

Sutton fell and lay on his back at right-angles to the road, with his head near the edge of the road and his feet his full length from the road. This statement is made here in explanation of the last three sentences quoted, and to show that a man on horseback at Sutton's *feet* might not be seen from "the rest," when one so mounted at his *hips* or *head* might be in full view from that place.

John Winkler was one of the first persons to

examine Sutton's dead body, and to note its position and the surroundings. He says: "I saw what looked like the sign of men at four places at the log;" and, after giving substantially the same description of "the signs," in detail, as that just quoted from Lewis, he continues: "I could stand on the ground where Sutton lay and see the rest under the log. All the signs looked like fresh signs. * * * I went and looked at the place particular. * * * I am brother-in-law of Sutton and distant relative of defendants."

At the time Sutton was shot he was returning into the road, having just ridden slightly to the left "around a mud-hole."

Wm. B. Davis, a practical land surveyor, who went upon the ground and made a map of the road, states: "I saw a man on a horse, and he rode around the mud-hole and turned into the road, and from supposed rest, about middle of log, he was in plain view."

Wm. Standeford says: "I found a cartridge shell behind and near the beeches, and on the opposite side of the log from where Sutton was killed, some days after the killing. I found it not more than three feet from the log, and nearly straight behind the beech nearest the road. * * * It was somewhat covered up in dirt and leaves."

The witness produced the shell in Court. Upon examination of it, the fact appeared that it was a 38-caliber Winchester rifle cartridge shell, corre-

sponding precisely with the ball cut from Sutton's back, and being the same kind used in the Winchester rifle which "Big John" says he fired at Sutton.

Dr. Stone, who examined Sutton's body at the time of the Coroner's inquest, thus describes the wounds: "One shot had entered the body a little to the right of the left nipple, and was cut out about two inches to the right of the backbone. I saw a wound on his right shoulder, and three wounds on his right arm, and one that had entered his right temple and come out near and behind the left ear."

The character and direction of these wounds, together with the position of the body after it fell from the horse, demonstrate the fact that the first one mentioned was fatal, and that the others were inflicted while the body lay upon the ground.

To bring knowledge of Sutton's movements home to the defendants, the State introduced Clinton Leyer, who said: "I was rafting on Wednesday or Thursday before the killing on Saturday, and defendant, *Clinton Barnard*, was there, and, in a conversation about the hogs between us, he asked me if Sutton didn't come home *on Saturday evening* and go back on Monday morning, and I replied he did. I do not remember who commenced the conversation between us. My brother, Marion Leyer, was there. We were talking about the difficulty most every time

we met. I was expecting a difficulty between Sutton and 'Big John.'"

Marion Leyer says: "I heard defendant, Clint, ask my brother, at the raft, if Sutton did not come home every *Saturday evening* and go back to the still-house every Monday morning, and he told him he did. I also heard him say then that 'Big John' wouldn't make affidavit."

The defendant, Clint, says, in effect, that he does not remember making the inquiry of Clinton Leyer; but it is nowhere controverted that the defendants knew the truth of the matter inquired about.

The first testimony offered by the defense was given by the defendants themselves. Already we have stated what they say up to the time they reached their cousin, Anderson, at the fence about one hundred yards from the fatal spot. Their testimony with respect to what occurred thereafter can best be presented in their own language.

"Little John" says: "We came over where Anderson was, and while we were standing there Elbert Leedy passed down the road. We then started over to the road. Anderson said for us to go on, he would come, and as we went down the hill Clint stopped on the hill; said he had to step aside. Myself, Prior's Ance [Anderson], Elisha, and 'Big John' went on down toward the road. John got to the road first. He asked me who that was going down the road. I replied, Elbert Leedy. I thought I heard horses' feet and looked

up the road, and saw Henly Sutton with gun presented towards 'Big John.' I said, 'Lord have mercy!' and ran across the road. 'Lisha followed me. After the shooting stopped, me and Elisha came back to the other boys. I did not hear Sutton's name mentioned. We had not been in the road a minute when I saw Sutton. We never went there to meet Sutton; there was no such understanding or agreement. Not a man shot but 'Big John.' We never went to Sutton after he was shot. We never went any nearer than when we met and talked with John Mills. None of the defendants touched his gun. John Mills was with Sutton. * * * John fired six or seven shots. I saw Sutton after shooting was over; did not go to him. John did not go to him. * * * We all left together, and just after Mills left. Anderson did not fire, only John."

Taking up narrative at same point, "Big John" says: "I saw a man passing the road. It was Elbert Leedy. We went to the road, down along the fence. I crossed the marsh at the foot of the hill on an old log; stepped upon a mossy bank; heard John say 'Lord have mercy!' I looked; saw Sutton raising his gun. I shot. I had not seen Sutton before, that day. I shot six or seven shots. Mills was with Sutton. I shot two or three shots before Sutton fell from his horse. * * * We had not been at the road until after Leedy passed. Clint had stopped on the hill. * * * I went home from there, and went

early next morning and surrendered to Deputy Sheriff. I did not go there to meet Sutton. We had no such agreement or understanding among ourselves. I shot as fast as I could. * * * * * * I shot to keep Sutton from killing me. I was not at the log, and did not shoot from behind it. I shot from side of road, right side coming down. * * * I done all the shooting. * . * * I had a 38-caliber Winchester rifle; and did not go closer than twenty or twenty-five steps of Sutton's body. I was about this distance from his body when I had the talk with Mills. I did not agree to stay and watch the body of Sutton. * * * I had a Winchester rifle; would shoot fifteen or sixteen times; sometimes carried it half-cocked. After first shot could not see very well; smoke was in my way. I don't know how far I advanced. Did not know he was dead while I was shooting. * * * When I heard horses' feet, and John said 'Lord have mercy,' I was looking down the road at Leedy; had my gun in hand holding it down when I looked around; saw Sutton raising his gun. I immediately raised my gun and fired; fired two or three shots before Sutton fell from his horse; fired in rapid succession. * * * When I first saw Sutton he was some forty or fifty yards from me."

Clint says: "I stopped, to step aside, and the other boys went on down the road. I saw a man pass down the road in a trot, riding a gray

14 P

horse. I heard a gun fire, and looked and saw Brother John and Elisha running across the bottom. I saw 'Big John' and his brother, Ance (Anderson). John ('Big John') had his gun to his shoulder. I raised up, and then saw John Mills in the road about seventy-five yards above where 'Big John' was standing. Mills was on his horse. I saw another horse standing there. I could not see Sutton from where I was. We did not go there to meet Sutton. * * * I had no gun. I had a gun at home, but did not take it with me. The boys had no more than time to get to the road before I heard the shot. * * * The boys did not get behind any log, and there was no shooting done from across the road."

Elisha next states: "As we came down to the road I saw Elbert Leedy pass down the road on a gray horse. 'Big John' got to the road first. I heard horses' feet; looked up the road and saw Mills and Sutton. Sutton was raising his gun toward 'Big John.' I heard Vina's John ('Little John') say 'Lord have mercy!' and we ran across the road, and 'Big John' fired at Sutton. No one shot except 'Big John.' It was all done quick. We did not go there to meet Sutton; did not expect to meet him. * * * We did not get behind the log, and there was no shooting done from about the log. * * * 'Big John' can shoot as quick as anyone I ever saw. I have seen him turn on his heel and

shoot at a tree four or five inches across, thirty or forty yards, and he would hit it every time. * * * Neither one of the defendants went up to where Sutton lay. John Mills came on down towards where we were. We all met, talked, and started off down the road away from Sutton, and went on home. Next morning 'Big John' went and surrendered himself to the Deputy Sheriff. I did not surrender, for I had done nothing. * * * Don't know that I heard Sutton's name mentioned that day."

Anderson, the other defendant, testified as follows: "We went on down the hill. 'Big John' got to the road first. I was looking down the road at some one that had passed. I heard Vina's John say 'Lord have mercy!' I looked up the road; saw John Mills and Henly Sutton coming down the road. Sutton was raising his gun to shoot, as I thought. He was raising it toward 'Big John,' and John fired. We did not go there to meet Sutton. * * * No one shot but 'Big John.' * * * He moved as he fired, sorter in the direction of Sutton. * * * We did not go to Sutton after he was killed. * * * The reason we came down to the road to go to Ance's (Anderson's) and Uncle George's was there were briers and bushes the other way, and it was steep. 'Big John' is the quickest shot I ever saw. He could turn on his heel and hit a tree not more than a foot thick forty or fifty yards. I have seen him do it with his

Winchester. Clint had no gun; did not bring his gun. We did not get behind any thing. * * Me and John ('Big John') went closer to Sutton than any of the other boys. We went, perhaps, in fifteen or twenty steps of his body."

As corroborative of the statements made by the defendants on the main point, we give the language of their cousin, Anderson, namely: "I was not quite done my fence, straightening it up and putting the brush on, * * * when the boys came to me in the evening. Leedy passed before defendants went to the road. I told them to go on to the house and get some dinner, that I would come. * * * From the place where I was I could see all along the road from the log to above where Sutton fell. I saw Sutton and Mills just as they came to where the branch crosses the road. Sutton turned on his horse to the left around a mud-hole; he was in the path. The boys were just getting to the road. I saw Sutton raise his gun. Then John ('Big John') shot. From where I was I could see both parties; nothing to obstruct my view. I saw Sutton raise his gun. He had it in his right-hand; was bringing it to his shoulder. * * * I saw his horse throw his head up, as if jerked, just as Sutton raised his gun. I saw no one shoot but 'Big John.' He shot six or seven times very rapidly. * * * I was also arrested on a charge of the murder of Sutton, but was discharged by the Magistrate."

The defense introduced several witnesses to show that a man could not be seen on a horse where Sutton was killed from the rest under the log. On this point George Barnard testifies: "I was down where the killing was done. Could not see a man on a horse from limb under log, where they said Sutton's body lay. A steep bank cut off the view. I was there the day C. H. Coleman and others were there. Marion Lewis and others showed me the place."

Marshall Manus says: "Could not see place where body lay from the rest for the bank that was near to beech."

Isham Sutton states: "A man could not be seen on a horse at the place pointed out to me where Sutton lay from the supposed rest. I could not see a man on a horse from the rest, nor could I see him when I stood on my feet. The view was cut off by a bank on the right side looking from the log."

McH. Ross says: "As shown, a man on a horse where he was shown to have lain could not be seen from the limb under the log."

And finally, C. H. Coleman, one of the counsel for the defendants, who examined the locality with the four preceding witnesses, and made a map "some two or three weeks" before the trial in the Court below, testifies: "A man was placed upon a horse where the middle of Sutton's body was said to have been, and I looked from the supposed rest at the log and could not see him. I then stood up and could not see him."

Such, in the main, is the case on both sides as made by the testimony.

Without an elaborate discussion, some further comment will be indulged before we give expression to our conclusions from the whole body of the proof. In doing this we begin with the question last mentioned, which seems to have been a matter of unnecessary solicitude in the Court below.

The conflict in the evidence with respect thereto may be reconciled, and yet give every witness credit for speaking the truth, by the natural and reasonable assumption that the observations whose results are detailed, were made with the horse and rider at one time in a slightly different place from that occupied by them at another, the hill being so near the road as to entirely obstruct the view in one place and not at all interfere with it at another, only a few feet away. No doubt this mode of reconciliation was adopted by the jury, for none of these witnesses were impeached, and there is no positive proof that the position of "the person on horseback" was precisely the same when some say he *could not be seen* as when others say he *could be seen.* Of all the witnesses speaking to this point, Mills, confessedly, knew best where Sutton was at time of first shot, and he says a man *could* there be seen from the rest. Be this as it may, the question is an unimportant one. Whether Sutton could or could not be seen from the rest at the fatal moment can neither

strengthen nor weaken the theory of lying in wait. Whether the fact be one way or the other is altogether immaterial, for the very evident reason that neither the State nor any of her witnesses *claim that the first or any other shot was fired from the rest.* Mills says that after the first shot, and when he looked in the direction of the log, he saw the smoke of the gun rising above and over the log between the two beech trees. These, it is shown, stand in front of the log, between the rest and the road. Behind the log, near these, and between the rest and the road, were two "signs of men," *from either of which* it is not denied that Sutton *could have been seen* at the time he was shot, and for some distance further up the road. In fact, it is entirely clear from the whole proof that Sutton might well have been seen from either of the two "signs" nearest the road; there was nothing to obstruct the view at any point from either of them for from one hundred and fifty to two hundred yards up the road in the direction from which he came.

The witness, Ross, while stating that a man on horseback where Sutton is supposed to have lain could not be seen from the rest, says "he *could be seen* from the beech," and that "the road could be seen one hundred and fifty yards, looking up the road from the beech."

Standeford says he found the cartridge shell "not more than four feet from the log, and nearly straight behind the beech nearest the road." So

that both the smoke and the place of the shell, so far as significant at all, indicate that the shot was fired from near the beech trees, from which *all admit that Sutton could have been seen,* and not from the rest, where the view might or might not have been obstructed, according to the precise position of the object. Therefore, we repeat that it is altogether immaterial and unimportant to determine whether Sutton could, at the particular time, have been seen from the rest.

Were the defendants lying in wait? Was the first shot fired from behind the log, as contended for the State, or from the mossy bank across the road, thirty to forty feet from end of log, as contended by the defendants? This *is* a vital question, and about it there is much dispute.

All witnesses agree, substantially, as to the position of the log and the mossy bank with respect to each other, and with respect to the place at which Sutton was killed. So all agree that one shot was fired from the mossy bank. Mills and Leedy say that was the second shot, and not the first, while the defendants say it was the first.

Mills and Leedy give a detail of facts about which they could not be honestly mistaken. Hearing the report of a gun, Mills says he first looked at Sutton and saw him falling from his horse, and then looked ahead to learn the cause, and saw the smoke by the log and "Big John" *emerging from behind its end* and crossing the road to the mossy bank. Leedy, who was two to three hun-

dred yards below the log, hearing the first shot, turned *immediately*, and, looking back, *saw three men between him and the log*, one of them soon crossing the road to the mossy bank, from which he and Mills say the firing was renewed.

They could not have been deceived about what they swear they saw and heard. They are neither interested nor impeached. Their testimony is freely and frankly given, nothing being withheld, so far as we can see, that might benefit the defendants, to whom Mills is related, and with whom he is on friendly terms. Their statements are reasonable in themselves, consistent with each other, in accord with undisputed physical facts, and strongly corroborated in many important particulars.

That there were *four fresh signs* of men *behind the log*, and what seemed to be a *rest* under it, is positively and circumstantially sworn by several reputable witnesses, and disputed by *none*. These signs and this supposed rest are accounted for, in this record, *solely and alone* upon the theory that four of the defendants were behind the log and made them. Neither is the finding of the cartridge shell *behind and near the log* accounted for, unless it be true that it was there dropped from the gun after the first shot, and when preparation was being made for a second one, the expulsion of the empty shell and the substitution of a loaded one being accomplished at one and the same time by the easy movement of a lever on the gun for that purpose. That an empty shell was previously

found on the mossy bank and tossed upon the hill several feet in front of the log, does not explain the presence of one on the opposite side and behind the log.

Furthermore, it is stated by Mills and Leedy, and by all the defendants as well, that from the first shot on the mossy bank all the others followed "*in rapid succession.*" Concerning this there is no disagreement at all. The conflict is as to what preceded the first shot from that place. Mills and Leedy say there was one report, and that, *after awhile*, when a man ("Big John") had passed across the road to the mossy bank, the firing began again, and continued at very brief intervals to the end; while the defendants say that when the firing once began it was kept up without interruption until the work was done, "Big John's" language being, "I shot as fast as I could."

Now, that there was some considerable time elapsing between the first and second shots, enough for a man to walk from the end of the log across the road to the mossy bank, as Mills and Leedy say the fact was, is manifest from what two other witnesses testify. Marion Lewis says he and his wife heard the first shot; that he said to her, "That was a rouser," after which they "*talked a little* about it, and *then* heard several shots fired in succession." Wm. Trent, who was traveling on the same road, behind but not in sight of Sutton and Mills, says: "I heard *a shot* fired on before

me, and *then,* *after* *awhile,* some seven or eight more." The testimony of these witnesses corroborates Mills and Leedy *directly* as to the interval between the first and second shots, and *circumstantially* as to their claim that they were fired from different places, one behind the log and the other from the mossy bank.

That Leedy did not see the defendants and his horse did not shy at them when he went by the log down the road, by no means proves that they were not behind the log, and that he did not, in fact, see three of them there immediately after the first shot was fired, as he says he did. They may have been by the log in a stooping posture, as they naturally would have been if there at all, and thus escaped his observation, especially as he was riding fast and looking ahead and not to the side, as he expressly swears was the fact, and as the defendants admit, so far as the riding fast is concerned. Or the defendants, seeing him for one hundred and fifty to two hundred yards before he reached the log, as they could and certainly would have done, if there could easily have concealed themselves behind the uplifted and spreading roots of the log itself, which are shown to have been amply sufficient for that purpose.

Besides its direct antagonism to well-established facts, the testimony of the defendants is inconsistent in itself. Of the manner in which the defendants account for being at this particular place at this very opportune and auspicious moment; of

their quiet journey the night before, and their silent sojourn upon the peaks of the well-named "Troublesome Ridges" during the day and up to the time of the frightful homicide, we now make only the general observation that the story is extremely suspicious on its face, and may well have been too much for the credulity of an intelligent jury.

To their subsequent statements we give more extended notice at this point. Is it not strange, that, with innocent purpose and without any sign or motion attending "Little John's" exclamation, "Big John," who says he was looking down the road, should have turned immediately at the word and shot Sutton from his horse? Is it not stranger still that he should have been able to do so, raising his gun from his side and putting the ball with unerring aim so near the heart before Sutton, whose presented or rising gun had caused the exclamation, could fire at all?

There was no inquiry or explanation as to what "Little John" felt or saw; the exclamation was its own interpreter, and "Big John" wheeled and fired without delay. There was no reason why Sutton should not have fired first, if he had his gun *presented* as "Little John" says, or was *presenting* it, as other defendants say, when "Little John" cried, "Lord have mercy!" that exclamation being the first thing to attract "Big John's" attention, as he himself says.

Is it not also unreasonable that a man shooting

alone in self-defense, at long range and surrounded by armed friends, should advance upon his victim, firing five or six times after he had fallen from his horse, and while he lay motionless and dead upon the ground?

"Big John" attempts to palliate this feature of the case by saying he fired two or three shots before Sutton fell, from his horse. In this he arrays himself against the manifest truth of the matter. His co-defendants, even, do not pretend to sustain him on this point. Clint says he looked, *immediately* after the first report, and saw Sutton's *riderless horse* standing in the road. Mills says Sutton fell at first shot, and all the proof shows such to have been the fact. No one but "Big John" states or intimates the contrary.

The claim of defendants that the firing commenced about the time they reached the road, and that Sutton had his gun presented when "Big John" fired the first time, is in accord with the testimony of their cousin, Anderson, who alone corroborates their statement.

He says: "I saw Sutton raise his gun. Then John fired."

When it is remembered that this witness was at one angle of an almost equilateral triangle, with Sutton and "Big John" respectively at the other angles, and the sides being from seventy-five to ninety-seven yards in length, it must seem to have been something of a stretch of vision for him to see the movements of both at the same moment;

especially is this so when it is further remembered that he was supposed to be intent on his work, that he might complete it and soon follow his kinsmen, as he and they say he had promised to do.

The probability of such a sweep with the eye, at *this very instant* of time, would seem much greater, if, for any reason, the witness had previously made up his mind to make the observation, and was actually *on the lookout*, to see what would occur, or to give a signal for any purpose.

Though not directly impeached, this witness is a kinsman and friend of these defendants. Finding them in great need of corroboration at this point in their case, knowing their theory, and naturally smarting under the imputation cast upon him by his own arrest before the Magistrate, on a charge of complicity with the defendants in the commission of this very homicide, it is not unlikely that he gave some play to his imagination while upon the witness-stand, or, at least, that the jury so thought.

That "Big John" voluntarily surrendered himself to an officer of the law, and boldly confessed the homicide, is not a fact of much importance, as affecting his guilt or innocence. He knew that the act was witnessed by Mills, and may have chosen the alternative of surrendering rather than flee the country. He confessed nothing that was not already known. Of course no one can go into his thoughts and with certainty determine

the motives which prompted this action; but we think it can be reasonably explained upon either of two grounds, both entirely at war with innocence before the law: (1) He may then have supposed that he had the right to hunt Sutton down and slay him, because Sutton had threatened his life; or (2) he may have believed that he and the other defendants, five in all, could establish a case of self-defense by their oaths, true or untrue.

It is said that the theory of the defense may be aided by the position of Sutton's body and gun as they lay upon the ground, and the condition of the gun when found. Marion Lewis, one of the first persons to reach the place after the defendants had gone away, says: "Sutton was lying on his back, with his head at edge of road, and body at about a right-angle to the road, his right arm extending out from his body, and left arm drawn up and bent at elbow, the hand being toward the head. His gun was lying near his left shoulder, the muzzle passing the head, and the breech near his left arm obliquely to the road. * * * I think Sutton's gun was cocked, and I saw Sampson Williams let the hammer down." John Winkler says: "The hammer of Sutton's gun was pulled back. The gun was on the left side of Sutton, with the muzzle toward the road."

We see but little, if any, importance in the *position* of the body and the gun, since we know no rule, and have no expert testimony by which it can be determined on which side of the body

the gun would have fallen, or in what condition the body itself and the arms would have been left, if the gun had been presented, or had not been presented, when the enemy's fire was received. Suppositions or conjectures about such a question cannot be indulged with profit or satisfaction.

If the gun was in fact cocked, *so as to be ready for shooting*, that would be a circumstance of some significance, but if only half-cocked, that would not be so. The witnesses just mentioned seem not to have had their attention called to the difference between cocked and half-cocked, and in their language they make no distinction between the two. One of them says he thinks the gun was cocked, and that he saw the hammer let down. The other says the hammer was pulled back. How far it was pulled back neither of them says; yet, whether the gun was cocked or half-cocked, in either case the hammer would be *pulled back* to some extent, and could be let down.

"Big John" says he "sometimes carried" his Winchester "half-cocked;" and Grant Jarvis, speaking of such rifle, says: "The gun is usually carried at half-cock, the hammer being pulled back to safety-notch."

It will be remembered that Mills left the defendants near the body of Sutton. He says they agreed to stay awhile. They say they made no such agreement, but admit that they did, in fact, remain a short while after he left. Giving his own language, Mills further says: "When I left

the defendants and the body of Sutton 'his Winchester rifle lay by his *right side,* nearly parallel with his body, with the muzzle pointing to his feet and the breech lying on or under that part of arm between shoulder and elbow." If this be true, the defendants must have changed the position of the gun, if nothing more, for it is shown that no one else could have done so before Marion Lewis got there and found the gun on *left side* of body. The defendants deny most positively that they went any nearer the body after Mills left, or that they touched the gun. What the truth of the matter is we cannot know; yet it is easy to see how the defendants could have seized and improved this favorable opportunity to make evidence for themselves. Undeniably their present defense had occurred to them before Mills went away, for he says "Big John" had said he was compelled to shoot in self-defense, and Anderson had inquired if he (Mills) did not see Sutton present his gun. Certainly it would have been neither unnatural nor a bad stroke of policy, from their stand-point, for them, with the thought of self-defense uppermost in their minds and the opportunity before them to cock the gun and give it and the left arm any position they deemed most significant, there being no eye to see and no witness to report the act.

A fundamental inconsistency in the claim of innocence on the part of the defendants is found in the fact that they were ·on this road at all

15 P

when Sutton came along. Confessedly they knew that Sutton was accustomed to travel upon this road on Saturday evening. They had been reassured of this fact through Clint's inquiry of Leyer only a few days before. They do not claim to have supposed he had already passed, though the day was almost gone. The time for meeting him was ripe, as they must have known. It cannot be believed that they entered this road at this time and place without thought of Sutton, and with innocent purpose, intending, as they swear, to walk upon it half a mile in the direction of Sutton's still-house, and to the home of their Uncle George. More than four hours before they were as near their uncle's house, on the almost opposite side, and about one mile from the place of the homicide.

John Ratliff, who is in no way impeached, says he saw four or five armed men, between 10 and 12 o'clock that day, " coming up toward top of ridge about half-way from still-house to George Barnard's;" that he heard one of them say, " We will go over to Uncle George Barnard's, or on the ridge opposite Uncle George Barnard's;" and the same witness further says that " at different points along top of ridge you could see parts of the road *all the way from still-house to place of killing.*"

Why should these defendants spend even these four hours (conceding that they had previously been further away hunting Mary Lawson, as they

claim), in the dead of winter, within half a mile of their uncle's house, and without their dinner? Why should they approach his house (for Ratliff says they were going in that direction when he last saw them), pass near by, and go beyond, only to enter the road at or near *a large log by the road-side, in the edge of a narrow, "wooded hollow,"* and travel thence *back* for half a mile, and this without any *thought* of Sutton or *mention of his name?*

We believe they were watching for Sutton's approach, besetting his pathway for the purpose of taking his life. Their own testimony, though denying, goes far to confirm this conviction in our minds.

That Sutton, on horseback, should have first presented his gun and attempted to open fire on four well-armed footmen, all in sight, as they say they were, involves the highest degree of improbability. To have done so would have been to invite certain death. But, if they were lying in wait for the purpose of taking his life, as we believe the proof clearly shows to have been the real situation, and he, discovering them, attempted to fire, that would in no sense mitigate their crime in killing him in pursuance of their original design. In this view it matters not in what position or condition his gun was found after his death, or in what position he held it when shot.

Regretful as we may be, and *as we are*, that it is so, the verdict of the jury is sustained to our entire satisfaction.

Barnards *v.* The State.

Next we pass to the consideration of errors of law assigned in behalf of defendants.

*First.*—After verdict, and on same day, motion for new trial was entered and continued until next morning. When next morning came, counsel for defendants made successive motions to continue the motion for a new trial until the ·day after, or until the afternoon of the same day, both of which the Court refused, " unless good ground was shown on affidavit," whereupon one hour's time was asked for the preparation of such affidavit, and this was refused, " unless some ground for delay to write affidavit" should be shown or stated. Because " no grounds or reasons were mentioned or offered by said counsel, and nothing being stated in reference to any ground or reason for delay, or stated as to what was to be stated in said affidavit, the Court stated that ample time had been given already, so far as he could see," and, after argument, overruled the motion for a new trial.

This action of the Court is now assigned as error. We think it is not error, but most manifestly right. No affidavit was produced, and no fact was stated that was desired to be placed in an affidavit, nor was any thing stated " in reference to any ground or reason for delay." Further indulgence was not required by any rule of law or practice, in the absence of any statement or *intimation* of any known or *suspected* fact to the advantage of defendants, or that any investigation was being made or contemplated.

*Second.*—We cannot agree to the suggestion that the jury were misled, or erroneously charged on the subject of *apprehension;* that they could, fairly and legitimately, have concluded, from the instruction given, that the defendants could establish self-defense *only* by showing that they, or one of them, was *in fact* in danger of death or great bodily harm when the fatal shot was fired, and that it would not be sufficient to show that an *apprehension* of such danger was entertained, and upon *reasonable grounds.*

On this point the Court said to the jury: "Self-defense, therefore, rests upon necessity, actual or *apparent.* A common assault, not actually or *apparently* endangering life or great bodily harm, will not excuse a homicide in repelling it. But to excuse a homicide the danger of death or great bodily harm must be real, or *honestly believed to be so,* and *on reasonable grounds.* The danger must be *apparent* and imminent, and existing at the time of the fatal injury, or *honestly believed to be so, and on reasonable grounds.* The .belief or apprehension of danger must be founded on *sufficient circumstances to authorize the opinion* that the purpose to kill or do great bodily harm then exists, and the fear that it will at that time be executed."

This extract correctly states the law, and in every sentence, as is readily seen from the italics, which are ours, the Court distinctly repudiates the idea that a homicide can be justified, or self-defense

established *only* by showing the existence of *real danger.*

The language is almost precisely the same as that used by this Court in *Rippy* v. *The State*, 2 Head, 218, and approved in other cases: 3 Heis., 394; 4 Bax., 252; 6 Bax., 457; 5 Lea, 369; 6 Lea, 257.

No particular complaint is made of what we have quoted, standing by itself; but the main criticism is of what followed. In a subsequent part of the charge, when the Court came to apply the law more directly to the facts of the case, the jury were told, in substance, that the defendants would be guilty of no crime if the fatal shot was fired "under a well-founded belief and apprehension" of death or great bodily harm, but that they would be guilty of some offense if the shot was fired "from any other feeling than a well-grounded fear or apprehension" of such danger. The objection is made to the words "*well-founded*" and "*well-grounded.*" It is urged that their use was improper, erroneous, and well calculated to mislead the jury and make the impression on their minds that they must find that there was *in fact* danger of death or great bodily harm before the defendants could be acquitted.

How such an impression could have been made (and we have no evidence or reason to believe that it was made) by the language used, it is difficult to understand. Certainly it has no such meaning to us, and we think it could not naturally

or reasonably have such a meaning to the jury. *Well-founded* and *well-grounded* signify the same thing confessedly; and full warrant for the use of the former by the trial Judge is found in the opinion of this Court in the Rippy case. There Judge Caruthers, speaking for the Court, said: "So a case must not only be made out to author-ize the fear of death or great harm, but such fear must be really entertained, and the act done under an honest and *well-founded* belief that it is abso-lutely necessary to kill at that moment to save himself from a like injury." 2 Head, 221. More-over, it is incredible that the jury could have received such an impression from these terms, when considered in the light of and in connection with what had previously been told them on the subject of apprehension. It was their duty to consider the whole charge, each and every part; and this record raises no doubt in our minds that they did so, and that they fully understood it.

Besides, upon their own theory of the case, if the defendants had *any* apprehension *at all*, it is manifest that it was *well-founded*, and that they could in no event have been injured by the charge on this point.

*Third.*—In the next place objection is made to what the Court said to the jury about the neces-sity of an *overt act.*

The charge on that subject is as follows: "Previous threats made by the deceased against defendant will not, of themselves, excuse the de-

fendant in killing the deceased; *but there must be
some overt act or words at the time, clearly indicative
of a present purpose to do the threatened injury.*"

So much of this instruction as requires an overt
act at all to justify the homicide in this case, is
assailed as unsound; the position being that, whatever
may have been the law in former times, an
overt act should not be required in this day of
the revolver and repeating rifle, especially with
such a man as the deceased is shown to have
been.

We are aware of no change, or reason for a
change, of the law on this subject since the decision
by this Court of the Rippy case, already
referred to, in which the language of the opinion
is: "Previous threats, or even acts of hostility,
how violent soever, will not of themselves excuse
the slayer; *but there must be some words or overt
acts at the time, clearly indicative of a present purpose
to do the injury.*" 2 Head, 219.

This language is precisely the same in meaning,
and almost the same word for word, as that used
by the trial Judge and quoted above. This is especially
so as to the portion of each relating to
the overt act, which we have italicised for the
purpose of emphasis.

The language of the Rippy case is quoted in
some and approved in all of the following cases,
since decided by this Court: *Williams* v. *The State*,
3 Heis., 394; *Draper* v. *The State*, 4 Bax., 251;
*Hull* v. *The State*, 6 Lea, 256; *Allsup* v. *The*

*State*, 5 Lea, 369; *Jackson* v. *The State*, 6 Bax., 257–8.

The opinion in the case last cited (Jackson's case) may by some be supposed to have changed the rule laid down in the Rippy case; but it does not do so *in fact*, and was not *so intended*, as is readily seen from the very clear and vigorous language of the writer, the lamented Judge McFarland. He expressly recognizes the doctrine of the Rippy case as sound, and undertakes to show, and does show to a demonstration, that different facts will constitute the ever-necessary overt act in different cases; that greater demonstration of a deadly purpose is required, where the slayer and slain have previously been friends, than where they have been enemies, and the deceased has made threats against the life of the defendant. To use his own words, he says: "The necessary overt act in the one case might be different from the other. It is difficult to lay down a rule exactly governing all cases, the circumstances of the cases differ so widely. The overt act that will justify a defendant in assuming that his own life is then in danger must depend upon the circumstances of each particular case." 6 Bax., 458, 459.

This quotation from the opinion itself, is sufficient to refute all claim that the learned Judge delivering it could have intended to say that the overt act, theretofore required by all the authorities except the Kentucky cases, could or should be dispensed with in the administration of the criminal law in this State.

The Allsup case is no more a modification of the Rippy case on this point. The learned Judge who delivered the opinion in the Allsup case, in extracting the true rule from the Williams case (3 Heis., 394) quotes therefrom, with approval, as follows: "There must be words or overt acts at the time clearly indicative of a present purpose to do the injury," thus using with approbation the very words of the Rippy case. 5 Lea, 370. It is true the Williams case is criticised in the Allsup case for confining the overt act to the "*moment*" of the homicide; but that there should always be an overt act to constitute self-defense is neither denied nor questioned in the slightest degree. *Ib.* It is further said in the Allsup case, on the same page, that the justification "must appear from all the facts and circumstances of the entire transaction, taken together as a series of events."

So the trial Judge in this case instructed the jury: "No exact rule of law can be laid down which will govern in all cases of self-defense. Each case must stand upon its own facts and circumstances, taken together as a series of events."

Thus we have seen that the charge with respect to *overt act* is strictly within the decisions of this Court, which we think entirely sound and worthy to be followed.

But in reality the taking of nice distinctions on this subject could have been of no possible moment to the defendants in this case, for, if their theory of the fatal meeting was to be credited by

the jury, there was unquestionably an overt act on the part of Sutton of the most marked and unmistakable character; and, on the other hand, if the theory of the State was to be accepted, the defendants were lying in wait, and no overt act by Sutton, howsoever violent, would, under such circumstances, have justified them in taking his life.

*Fourth.*—And, finally, it is insisted that the charge is fatally defective, in that it omits the usual instruction in a case of *purely circumstantial evidence*, which it is contended this is, as to all the defendants except "Big John."

The instruction on the law of conspiracy and reasonable doubt, or so much of it, rather, as need be here noticed, is in these words: "In this case, if the evidence should satisfy your minds, to the exclusion of all reasonable doubt, that the defendants entered into a conspiracy to go and hunt up, or waylay Henly Sutton, the deceased, and to kill him, then the act of any one of them done in furtherance of the common design would be the act of all, and all would be equally guilty of the act, and liable to the same punishment therefor."

This charge is not assailed as unsound or inaccurate, so far as it goes, but the earnest contention is that the Court should have gone further, and told the jury, in substance, that to convict the defendants in this case the proof must be so clear and convincing as to exclude every other reasonable hypothesis than that of their guilt, and

that this must be true as to each and every one
of them.

It is well-settled law that such additional in-
struction must be given where the guilt of the
accused is sought to be established upon *circum-
stantial evidence only*, and that, too, notwithstanding
the doctrine of reasonable doubt be already em-
braced in the charge.     *Smith* v. *The State*, 2 Leg.
R., 56;   *Turner* v. *The State*, 4 Lea, 207.

Though it is a well-established and just practice,
we do not think the rule applicable to the case
before us, because the guilt of the defendants *does
not* depend *alone on circumstantial evidence.*     Such
is not the dependence of the State as to any one
of them.     That it is such a case as to "Big
John" is, of course, not insisted, for he confesses
that he fired six or seven shots.     That it is not
such a case as to Anderson is equally clear.   Mills
says that he saw Anderson fire one time.   To say
that this statement of Mills is denied and shown
to be untrue does not make it any the less *direct*
testimony of *the fact.*     The statement is not a
*mere circumstance* tending to show *the fact*, but it
is *direct* testimony of *the fact itself.*     Whether it
was true or not is quite another question, and
that was for the jury to determine, under the
rules with respect to conflicting evidence and the
doctrine of reasonable doubt.

The case against the other three defendants,
though partly circumstantial, is likewise not de-
pendent entirely on *circumstantial* as contradistin-

Barnards *v.* The State.

guished from *direct* testimony. They were in fact upon the very scene of action, as they themselves admit, two of them armed with Winchester rifles, and the other one only temporarily absent, and then very near by. Not only were they, to all intents and purposes, present at the time, so that they might have rendered assistance if necessary, but the positive facts of the record are that the whole five of the defendants were in fairly easy reach of this road all day; that they came to this place together, and that, after the act, they met near the body, consulted, and departed all together. Elisha says: "We all met, talked, and started off down the road away from Sutton, and went on home." True there are many circumstances connected with these facts, and throwing light upon them, which were material and important to be considered in arriving at a just conclusion in the case, yet that does not make it *a case of circumstantial evidence.*

In one sense, of course, the facts we have just mentioned are only circumstances indicating the main fact—a purpose and readiness to encourage or render needed assistance in the taking of Sutton's life; still they are not merely *circumstantial evidence* in the contemplation of the cases cited. Otherwise it might be said that the fact that "Big John" discharged his gun in the direction of Sutton was but *a circumstance* indicating his purpose to kill. That would be unreasonable in the extreme.

Actual and close association with the principal actor near the scene, and for hours before the time; actual presence with him when the act is done, with means of rendering assistance; rallying promptly around or near the dead body after the deed is accomplished—thus sustaining and supporting the principal actor, and thereby concurring in the act itself—are all *facts*, and not *mere circumstances* in the legal sense; and evidence of them is *direct*, and not *circumstantial evidence.*

In behalf of the defendant, Clint, it is well said that the fact that he had no gun, and was not at the road when Sutton was killed, should weigh something in his favor. Nevertheless, we think that fact becomes unimportant in view of the other facts that he, a few days before, inquired of Clinton Leyer if it was not the habit of Sutton to go home Saturday evening; that he voluntarily joined the other defendants at his mother's house the night before; that he made the suggestion that they should go out upon "Troublesome Ridges" Saturday morning, and that he stopped on the side of the hill, from which he could command a view of the road on which Sutton was expected to travel, and from which he could give all necessary and desired signals to the other defendants at or behind the log. Whether the line of signals extended further up the hill, to the place where their Cousin Anderson stood, it is not necessary for us to surmise.

If it be true, as we believe it is, that the other

Barnards *v.* The State.

defendants had been watching different parts of this road during the day; if it be true that the other defendants made the undisputed signs and preparations, and were .lying in wait at this particular place and behind the log, as we believe it is, then it cannot be true that Defendant Clint was ignorant of their purpose or innocent of their crime.

We have given this case, in all of its aspects, a most solicitous and painstaking consideration, and in doing so we hesitate not to say we would have been glad to find these young men innocent of the charge laid at their door. The deceased made unjust and violent threats against two of them, but that can afford neither moral nor legal justification for taking his life.

Let the judgment be affirmed.

Judges Lurton, Folkes, and Snodgrass concurring; Turney, C. J., dissenting, because he does not believe the verdict sustained by the evidence.