J. B. ALLSUP, in error, v. THE STATE.

CRIMINAL LAW.  *Homicide.  Justification.*  To excuse a killing on the ground of self-defense, the facts upon which the justification rests must appear from all the facts and circumstances of the entire transaction taken as a series of events, and be real and be acted on in good faith by the defendant.  To confine the attention to the very *moment,* would in many cases be unjust, and be equivalent to debarring a party of the benefit of the right of self-defense altogether.

FROM GRAINGER.

Appeal in error from the Circuit Court of Grainger County.    J. G. ROSE, J.

J. T. & J. K. SHIELDS and HENDERSON & JOUROLMON for Allsup.

ATTORNEY-GENERAL LEA and J. M. MEEK for the State.

FREEMAN, J., delivered the opinion of the court.

The defendant was indicted for the murder of Marion Ballinger in May, 1874, at a school-house, where the parties had met in attendance on a civil trial before a justice of the peace, the case being between defendant and one Yeates—Ballinger having been present as a witness for Yeates.    The conviction is for murder in second degree.

The material facts of the transaction described in the record are few and easy to be understood from

the record.    There is in fact but little if any dis-
crepancy in the statements made of the leading and
essential facts, by the witnesses for the State, and
those for the defendant.    Some things, as is almost
always the case, were seen and noted by some wit-
nesses, that were not observed by others, or were
observed by the one witness more closely, and conse-
quently detailed more definitely, than by others; but
this only presents the usual feature of human testimony,
substantial agreement with some circumstantial varia-
tions in the details of the statements as made by the
witnesses.    A brief summary will present the material
facts of the case.

The parties had assembled in the school-house pre
paratory to the trial that was about to commence.
The witnesses of the parties were being called up to
put them under the rule.    The defendant was sitting
in the house, some witnesses say, with his knife open,
sticking it occasionally in the floor.    He had sent his
brother, it seems, after some whisky.    Learning or
seeing perhaps that the brother had returned, he got
up, gave the signal to a friend, and left the house
for the purpose no doubt of getting a drink.    It is
said that as he passed Ballinger he tapped him with
his hand—some say, "nudged him."    The defendant
went out, had his knife open taking the cork out of
the bottle in order to get the liquor.    He had prob-
ably, with his brother and another friend, taken a drink,
and was talking rather loudly and boastfully about this
time.    Ballinger. while the parties were standing under
or near a tree engaged in drinking, came out of the

house, passed around them, went to the branch, a few steps below them, got a drink of water, and started back, passing by the parties, with his coat on his arm—some of the witnesses say he had his knife in his hand. As he passed towards the school-house, the defendant said in a loud voice, that he was the best man on the ground, and could whip any man on the hill, except his friends—probably repeating this idle bravado several times, with other like foolish talk. Ballinger turned and said, if you mean me I am here. Defendant about this time started towards Ballinger with his knife open, and the weight of the testimony, when taken in connection with Ballinger's character for courage and willingness to fight, is that he advanced at the same time towards defendant; when near each other, probably three or four feet apart, the constable, Acuff, interposed, caught hold of defendant, and said he was going to have order. He probably had hold of his arm, the knife being in the hand thus held. The altercation here seems to have become somewhat personal between the constable and defendant, and Acuff seems to have thought his manner threatening towards himself, as he dropped his hand, as we take it, significantly, towards his pistol, indicating evidently a purpose to resort to it if necessary. A crowd seems to have formed a sort of circle around these parties at this time. When the officer dropped his hand towards his pistol, the defendant said, if that is what you want, or mean, or some words to that effect, " I'll throw my knife away," and did throw it over his shoulder into the creek behind

him, at the same time telling the constable he surren-
dered, or would behave himself.    The constable was
still holding him, one witness says—or more—with his
arm around him, when in a moment after the time
the knife was thrown away, or a very short time at
least, Ballinger, who was on the outer circle of the
crowd, sprang at him, and struck at defendant a vio-
lent blow, an overhanded lick—all the witnesses, we
believe, but one agree—striking with his fist, and the
little finger of his hand held downward.    The large
preponderance of the witnesses, both of the State and
the defendant, concur in the fact that he had a knife
in his hand when he struck this blow, though it was
not probably opened—is not shown to have been at
at any rate—and, we take it, that it was not opened.
Several of the witnesses say it was a large knife,
some, a good sized knife; of this fact there can be
no question.

When Ballinger struck this blow, Allsup sprang
aside or dodged, as the witnesses say, and Ballinger
missed him, his hand passing near the brim of his
hat.    The ground seems to have been sloping here
down towards the creek, and missing his aim, aided
by this fact and from the forward impulsion given his
body to make the blow, as well as the violence with
which it was given, Ballinger fell forward to the
ground.    He immediately recovered himself, turned
his face towards the defendant, was in the act of get-
ting up, some say on his "all-fours," but evidently
rising, to renew the struggle he had thus commenced,
when the defendant jerked himself loose from the

officer, drew a rock from his pocket, and threw it at Ballinger, striking him on the side of the head. The rock seems to have been a thin one, not large, as it split, and rebounded from the skull, one part we believe going into the creek beyond. From this blow, in about nine days, Ballinger died, it having produced from the concussion a fracture on the back part of the head, opposite to the point where it struck; a small blood vessel was ruptured at this point and the discharge of blood ultimately produced pressure on the brain, from which death followed. Ballinger, however, at the time did not seem much hurt, but went to the creek and washed his face, and exhibited a purpose to renew the conflict as soon as an opportunity should present itself. The defendant, in company with his friends, immediately went into the school-house, and so the conflict ended.

These are substantially the facts of the case as shown by this record, so far as the immediate transaction is concerned; in fact, what we have thus summarized, we think, embodies the essential elements for the solution of the questions submitted for our decision.

Assuming for the time, that the defendant advanced at first without justifiable or legal cause, and if he had killed Ballinger at that time when he approached him, that it would have been murder at common law, or murder in the second degree under our statute by reason of heat of blood caused by the sudden altercation, still the other facts shown must be looked to, as separating the transaction into two parts, to be

definitely kept in mind, in order to a correct legal conclusion as to the measure of the guilt of the defendant.

He had been seized by the peace officer, had been stopped in that assault, was being held by the constable, was in a conversation with him as to this arrest, was encircled by the crowd, and certainly was making no assault at the time on the deceased, whatever had been his previous efforts to such an end. He not only was not then assaulting the deceased, but had been arrested in that effort by the officer, and that assault must be held to have ended. In fact he could not have been assaulting, or even attempting at this time to assault Ballinger, because he was then held by the officer, and had voluntarily disarmed himself by throwing away his knife, and had submitted to the authority of the law. Certain it is, that the assault with the knife had ended, and become impossible after this, so that he was in condition, as Ballinger saw him, only to assault with his fist, even if he had been free from the grasp of the officer. But in fact he was not, as we have said, in condition to assault or attack the other party with his fist, and we may add, for such an assault Ballinger was abundantly prepared, both by superior strength and also by the fact that he had a large knife in his hand, probably unopened.

Under these facts it is evident that the blow struck by Ballinger at Allsup, with the unopened knife in his hand, was the commencement -of the new altercation which terminated in his death. It might be

plausibly argued, that seeing his adversary thus held, and disarmed, presented an opportunity on the part of a determined and aroused man, which he seized, to take vengeance for the previously threatened assault on the part of Allsup. We take it to be clear from the facts in this record, that had that blow not been avoided by Allsup, the result would probably have been very different. Be this as it may, it is certain this case must be considered, as the case of a man, attacked by a powerful adversary—justly provoked it may have been—struck at with an unopened knife in his fist, with most determined purpose to inflict all the injury he could, avoiding the blow, and thereby causing his assailant to fall to the ground; that assailant recovers as rapidly as possible, is rising with face turned toward his enemy with knife still in his hand; and in this precise state of the case, the assaulted party draws a rock from his pocket and throws it, striking him on the head, from which he afterwards dies. Can this be murder? We think clearly not. Suppose Ballinger had killed Allsup by the blow he struck, wou'd it have been a case of self-defense, under real or apparent apprehension of death or great bodily harm? No one could so maintain. If this be so, it must follow, that Allsup was unlawfully assaulted, in a violent and dangerous manner, and in reply to that assault, struck the blow that killed his adversary. Whether justifiable, or the blow, the performance of an unlawful act, depends on other considerations, which will have to be decided, under proper instructions, on another trial.

The law has been long settled on this subject in our State, and is, that if a party is in real or apparent danger of death or great bodily harm, or believes himself to be so, as evidenced by circumstances justifying that belief, as the facts appeared to him, and he in good faith, under such apprehension, kill his adversary, it is justifiable homicide. *Grainger* v. *The State*, 5 Yer., 459; *Ripley* v. *The State*, 2 Head, 217.

The principle of this case is well stated by the Supreme Court of Illinois in a late case, *Stuninger* v. *The People*, Law R., October 20, 1880, p. 489, as follows: " Men when threatened with danger, are obliged to judge from appearances, and determine by the actual circumstances surrounding them, at least as much as if placed in other less exciting positions; and it would be monstrous to say, that if they act from real and honest convictions induced by reasonable evidence, they shall be held responsible criminally for a mistake in the extent of the actual danger, when other reasonable and judicious men would have been alike mistaken."

We are not to be understood as deciding or intimating an opinion that this is a case of self-defense. That is a question to be decided on another trial in view of all the facts, under the principles of law we have announced. But we do hold, that on these facts, as shown in this record, a verdict of murder in the second degree cannot be sustained.

It is proper to refer to the language of his Honor in charging the law on this subject, which we think was calculated to mislead a jury, and should therefore be corrected. In telling them of the state of facts, that

24—VOL. 5.

would make out a case of self-defense, he says: "The danger must be imminent and apparent, *and existent* at the *moment* of the fatal injury." He repeats this language several times. These words, "at the moment," are found in some opinions of this court, as in the case of *Williams* v. *The State*, 3 Heis., 395, in the argument of Nicholson, C. J., but are limited or explained by the previous statement of the rule in the same opinion, or rather the rule is more correctly stated before this in the opinion. It is, "that to excuse a homicide, the danger must either be real, or honestly believed to be so at the time, and on sufficient grounds; there must be words or overt acts at the time clearly indicative of a *present* purpose to do the injury." p. 394.

The true rule is, that the facts on which the justification rests, must appear from all the facts and circumstances of the entire transaction, taken as a series of events, and be real, and be acted on in good faith by the defendant. To confine the attention to the very *moment* when the blow is given, would in many cases be unjust, and be equivalent to debarring a party of the benefit of the right of self-defense altogether. Take the case of a man who strikes at his adversary with a hatchet, or bowie-knife, misses his aim, and falls to the ground, but is recovering as rapidly as he can to renew the fight. The knife has fallen out of his hand, but he is reaching out for it, but is still down. At this immediate *moment*, there is no necessity to strike to save from death or great bodily harm, or "to kill *at that moment* to save from

.like injury." Yet who would say, the assailed must wait until his adversary has again armed himself and ready for effective and deadly work, before he can strike and be justified?

We add here, that all authorities agree, that if a party who has commenced an attack, however unlawful or even violent, desists, and abandons his purpose *bona fide,* so that his antagonist is in no danger of further violence from him, and is then in turn attacked by that adversary, he may lawfully defend himself from the threatened assault or violence in the same way as any other man, and has all the rights of self-defense belonging to him as a man. Much more will he have such right, if he has been arrested by the officer of the law, who has him in his power, armed with the means of enforcing his authority, and the party has submitted to this legal authority. He is then in the custody of legal authority, and is entitled to be protected while submitting to the authority of the law. An assault upon him by his provoked antagonist, while it may be reduced from a high degree of criminality by the previous provocation, is still unlawful and unjustifiable, and authorizes the use of the means of self-defense adequate to meet the new assault.

Again, the party may have drawn his pistol with a deadly purpose, it may be struck from his hand, but he springs for it, and as he is regaining it, he is shot by the party assaulted. This is clearly justifiable; yet at the *moment* he kills, there is no danger, the party may be turned from him, and only seeking

to regain his weapon. But the danger will be imminent in a few moments after, and the party thus threatened is entitled to anticipate it, when it clearly appears, and is justified in . killing to prevent the danger thus clearly shown to be threatened.

We therefore think these words should not be used, and do not correctly give the rule of law in such cases—certainly may mislead a jury.

For the reasons given, the judgment must be reversed, and the case remanded for a new trial.