EUGENE McGILL, Plaintiff in Error, v. STATE OF
TENNESSEE, Defendant in Error.—475 S.W.2d 223.

August 27, 1971.

Certiorari Denied by Supreme Court January 3, 1972.

MacFarland, Colley, Blank & Jack, Columbia, for plaintiff in error.

David M. Pack, Attorney General, Robert H. Roberts, Assistant Attorney General, Albert Noe, Assistant District Attorney General, Joe P. Binkley, Special Prosecutor, Nashville, for the defendant in error.

OLIVER, J. Represented in his trial by two eminently qualified attorneys privately retained, McGill was convicted in the Criminal Court of Davidson County of first degree murder in the pistol killing of John T. Brooks and was sentenced to 30 years in the penitentiary. Unsuccessful in his motion for a new trial filed by his trial counsel, the defendant is now before this Court upon his appeal in the nature of a writ of error duly perfected for him by the same attorneys. He then retained present counsel to represent him in this appeal.

In this Court the defendant challenges the sufficiency of the evidence to warrant and support the verdict of the jury, insisting specifically that he acted in his own necessary self-defense and that there is no proof of premeditation. The law is well settled in this State, and has been reiterated in numerous cases, that a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves

all conflicts in favor of the theory of the State. Such a verdict removes the presumption of the innocence of the accused which stands as a witness for him until he is convicted, and raises a presumption of his guilt upon appeal, and he has the burden upon appeal of showing that the evidence preponderates against the verdict and in favor of his innocence. Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn.Cr.App., 425 S.W.2d 799; Brown v. State, Tenn.Cr. App., 441 S.W.2d 485; Palmer v. State, Tenn.Cr.App., 435 S.W.2d 128; Morelock v. State, 3 Tenn.Cr.App. 292, 460 S.W.2d 861.

We summarize the material evidence. On the day in question, the defendant went to the home of his former girl friend to take some medicine to one of their children. Her sister, Cynthia Diane Beaird, was employed at John's Barbecue Pit in Nashville which was operated by the deceased who had come to take her to work and had parked his automobile in front of the house, waiting for her to get ready. The defendant parked two or three car lengths behind the deceased's car, took the medicine in the house and stayed only a few minutes. When he returned to the street he and the deceased became involved in an altercation in the course of which the defendant knocked out the glass in the left front door of the deceased's automobile and shot him twice with a .32 automatic pistol while he (the deceased) was seated under the steering wheel of his car, one bullet going through his left arm and emerging at the base of his neck, and the other entered his back and lodged in his chest. He drove about two blocks and stopped in front of a barber shop where he got out and collapsed on the

sidewalk and died in a Nashville hospital shortly thereafter, without a word about what had occurred.

Ballistic tests demonstrated that the bullet taken from the deceased's chest and another found in the seat of his car and an empty cartridge casing also found inside the deceased's car were all fired from the defendant's pistol which he surrendered to the police when he was arrested.

Cynthia Diane Beaird, called as a witness by the State, testified that the defendant arrived between 5:15 and 5:45 p. m. when "... the daylight was just going down. ... It was growing dark"; that shortly after the defendant left the house she looked out and saw him and the deceased at the left front door of the latter's automobile; that "... it looked like it was a scuffle or something going on. I'm not sure though. I'm not sure about that, but it looked like it to me. It looked like it. Because one of John's (deceased) legs was out of the car. Looked like he was trying to get back in the car or something. He was never really ... really out. It looked like he was just trying to get back in the car. I don't know what was going on, though"; that the defendant's back was to her and "I can't say what he was doing in front"; that she heard three shots fired in rapid succession and then saw the deceased drive off at a fast rate of speed; that the defendant then stood there a few seconds holding his left arm and wrapping a white cloth around it and then drove away; that she observed this episode between the two men through the front door as she passed to and fro in her rush to get ready to go to work, "... but as far as just standing there watching them constantly I didn't do it."

Larry Lawrence testified as a prosecution witness that late that afternoon "just on the urge of getting dark," he and a friend were walking their dogs in the alley behind the home of the defendant's girl friend and about three times saw him driving at about 30 miles per hour through the one-lane alley.

Officers arrived at the scene where the deceased collapsed within a few minutes thereafter and took possession of his car. No weapon of any kind was found in it, nor was any found in his clothing at the hospital. He lived with his mother and step-father. The latter testified that the deceased never carried a knife.

The criminal investigator for the Nashville District Attorney General's office testified that when he and a police officer went to the defendant's home to arrest him he said, "I know what you are here for"; that at headquarters he was fully advised of his constitutional rights and said only that he had nothing to say except that he didn't mean to kill the deceased; and that he saw some cut places or scratch marks on the inside of the defendant's left forearm but he was not sent to the hospital for treatment.

Testifying in his own behalf, the defendant said that as he walked back toward his car after leaving the child's medicine, the deceased drove up and stopped in front of the house about two or three car lengths in front of his own automobile; that as he came down the steps from the yard to the sidewalk the deceased opened the car door and grabbed him by the collar and jerked him around and threw him into the side of the car; that, employing vulgar epithets and profanity, the deceased

accused him of interfering with some of his employees; that, when he undertook to explain the deceased would not listen, told him that he (defendant) had no explaining to do, and slapped him; that "After I was slapped, I hit him with one hand and knocked him back into the car," but that the deceased still held on to him and pulled a knife from his pocket and struck at him, ". . . and I tried to get back, but he cut at me and he hit me one lick on this arm. And he come on up out of the car because . . . fear stricken me then and I ran. I didn't want to get cut. I circled around his car. When I was after, I seen a knife. I had a . . . a thought hit me, say, 'McGill, you got your pistol on you. Stop him before he kills you.' I ran around John's car and when he got to the door, I say . . . before . . . about the time he go to the door I done got the pistol out—brought it out with both hands and knocked the safety off of it and I say, 'Drop it, John.' When I say, 'Drop it, John,' John just went in the car. He say, '(obscene epithet), I got one.' And when he said that, he shut the door. I was about the back end of the car then—so help me. When he said, '(same epithet), I got one,' something happened to me. Fear that I couldn't overcome. The first thought in my mind was to run. Then another thought say, 'You ain't got time. You better try to stop him.' That's when I jumped to the window and knocked the window out. When I knocked the window out, I didn't have time to say a word. When I knocked the window out, John had straightened up about the time I knocked this window out and this glass went in on John. He was straightened up and he was looking up . . . shifted back at me. He turned his head kinda sideways to keep that glass from hitting him, but I could see by

the dash-light in his car that the pistol was in his hand, and I fired. I didn't even aim. I just pointed it and shot it. I was scared, more scared than I've ever been in my life. When I shot that first shot . . . when I shot this first shot, John turned plumb around in the seat—turned his back toward me. So help me God. I seen a pistol when it fell to the floor. I knew he'd dropped it. When he reached down . . . I couldn't see his hands, so help me, all I could see was the motion in his arm, and that's when he was hit back here. I shot again. After that, he whirled around. He reached up and got his gear lever; put his car in reverse, because he had pulled too close to the car parked right in front of him, and pulled straight out''; that he had never had any previous trouble with the deceased nor any ill feelings or animosity toward him.

On cross-examination the defendant testified that the cut on his arm required 12 stitches; that he pulled his pistol while the deceased was chasing him around the car trying to cut him with the knife; that when the deceased got into his automobile and closed the door and ''I seen a revolver in his hand,'' ''I didn't have time to say, 'Drop,' or 'Don't,' nothing, because when you got that much fear on you you can't think things out. You ain't got time to think out and say, 'Don't do this. Don't do that.' You have got to do what . . . that fear is all . . . is upon you''; that he shot the deceased in the back ''Because I had so much fear that I was only thinking of saving my life. I wasn't thinking of shooting him in the back. I wasn't thinking like that. I was only thinking of trying to stay alive myself. That's all''; that he knocked the window of the car out

with his pistol; that "My intention was to knock the window out, make him get out of the car, go to my car to avoid all of this. I didn't want to shoot him, but I . . . so help me God. I didn't want to get shot." When asked why he didn't run to his own car and get in and leave, the defendant said that "He could have caught me and killed me, Mr. Binkley. That's what I thought." Asked why he didn't keep the deceased covered with his gun and get into his own car and drive away, the defendant replied, "Stricken fear, Mr. Binkley, and you just don't have time to think things clearly"; that the entire episode occurred in the space of about three minutes; that his reason for being in the alley behind his former girl friend's house that evening was to try to find a parking place back there, as was his custom, instead of parking in the front, but he could not park at the rear on that occasion because a truck was stopped there and he then drove around and parked on the street in front of the house; that he did not put his pistol inside the car door and he could not explain why one of the empty shells was found on the right-hand side of the front seat of the deceased's car. Asked why he knocked the window out of the car, the defendant replied. "I didn't stick it . . . my intention was to make him understand that I didn't want to shoot him, but he already had it in his hand. I didn't have time."

■ The law of self-defense is well settled in this State. To excuse a homicide on the ground of self-defense, the danger to life, or of great bodily harm, must be either real, or honestly believed to be so, at the time of the killing, and such belief of danger must be founded on reasonable grounds. There must not only

be sufficient cause to authorize the fear of death or great bodily harm, but such fear must be really entertained, and the killing done under an honest and well-founded belief that it is absolutely necessary in self-defense. Rippy v. State, 39 Tenn. 218; Williams v. State, 50 Tenn. 37; Hull v. State, 74 Tenn. 249, 257; Barnards v. State, 88 Tenn. 183, 12 S.W. 431; Allsup v. State, 73 Tenn. 362; Draper v. State, 63 Tenn. 246; Cathey v. State, 191 Tenn. 617, 235 S.W.2d 601; Frazier v. State, 117 Tenn. 430, 446, 100 S.W. 94. See also Arterburn v. State, 216 Tenn. 240, 391 S.W.2d 648, and Nance v. State, 210 Tenn. 328, 358 S.W.2d 327.

The defendant's defense of self-defense presented a question for the exclusive determination of the jury. Arterburn v. State, *supra;* May v. State, 220 Tenn. 541, 420 S.W.2d 647. The facts obviously found by the jury clearly bring this case within the rule stated by our Supreme Court in May v. State, *supra.*

". . . Implicit in this argument [that the danger of death or great bodily harm to the defendant had ceased] is the well settled law of homicide that one cannot go further than is reasonably necessary in defense of his person. In others words, the right to kill in self-defense begins where the necessity begins and ends where the necessity ends.

"The authorities are in agreement on the limitations to a claim of self-defense:

After the peril to the victim has passed, as in the case when he has disarmed the original aggressor, and he then proceeds to beat the original aggressor

to death, the victim cannot claim a killing in self-defense, since the necessity for killing did not exist at the time the killing occurred.' 1. Wharton's Criminal Law and Procedure, sec. 214 (1957)''

By its verdict the jury rejected the defendant's theory that he acted in self-defense in killing the deceased, and has resolved that question against him. From the foregoing summary of the evidence, it must be plain that the jury's determination of that question was fully justified. Upon this record the jury could well find that all peril of death or great bodily harm, if any such in fact ever existed, had ceased when the defendant broke out the deceased's car window and stuck his gun inside and killed him by two well-placed shots fired within inches of the deceased, one in his left arm and the other in his back.

The distinctive characteristic of murder in the first degree is premeditation, which involves a previously formed design or actual intention to kill. Clark v. State, 218 Tenn. 259, 402 S.W.2d 863. To support a verdict finding an accused guilty of first degree murder there must, therefore, be an evidentiary basis for a conclusion that the killing was willful, malicious, premeditated and deliberate, unless it was accomplished by poison or by lying in wait or in the perpetration of or attempt to perpetrate one of the felonies named in the defining statute (T.C.A. sec. 39-2402), in which cases the specified circumstances make it unnecessary otherwise to prove deliberation and premeditation. Bass v. State, 191 Tenn. 259, 231 S.W.2d 707; Green v. State, Tenn.Cr.App., 450 S.W.2d 27. It is not necessary that this fixed design and intention to kill should have been conceived or have

pre-existed in the mind of the killer for any definite period of time prior to its execution. It is sufficient if it preceded the assault, however short the interval, for the length of time it was entertained is not the essence of this constituent of the offense. The design may be conceived and deliberately formed only an instant before its execution. Clarke v. State, *supra;* Green v. State, *supra.*

■ Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances in evidence. Clarke v. State, *supra.* The elements of premeditation and deliberation may be inferred from the circumstances of the killing. Edwards v. State, 221 Tenn. 60, 424 S.W.2d 783; Tooley v. State, Tenn.Cr.App., 448 S.W.2d 683.

Concerning the weight and sufficiency of evidence to establish premeditation, and particularly with reference to the nature of the act causing death, many courts have held that deliberation and premeditation may be inferred from the manner in which the killing was committed; and that repeated shots, blows, and other acts of violence are sufficient evidence of premeditation. 3 Warren on Homicide, sec. 273a, pp. 167-168. Such matters as the atrocity, cruelty, and malignity appearing in the circumstances under which the killing took place have been passed on frequently by the courts in considering the sufficiency of the evidence to sustain a conviction for first degree murder. 41 C.J.S. Homicide sec. 328, p. 71.

■ Upon this record the jury was fully warranted in finding that the defendant deliberately and premeditated-

ly murdered the deceased. He has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

Let the judgment of the trial court be affirmed.

Walker, P.J., and Mitchell, J., concur.