Steven Lamar JONES and Jay B. Burford, Plaintiffs-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

March 18, 1975.

Certiorari Denied by Supreme Court June 16, 1975.

Carlton H. Petway, Nashville, for Jones.

Monte D. Curry, Asst. Public Defender, Nashville, for Burford.

R. A. Ashley, Jr., Atty. Gen., Robert H. Roberts, Advocate Gen., Robert H. Schwartz, Asst. Atty. Gen., Nashville, for defendant-in-error.

OPINION

OLIVER, Judge.

In a joint indictment returned April 30, 1973, Steven Lamar Jones and Jay B. Burford were charged with the first degree murder of Deward Aines on an unspecified day in January 1973. In a joint trial, in which Burford was represented by the Public Defender and Jones by retained counsel, both defendants were found guilty of first degree murder. Following the trial court's charge that the punishment for first degree

murder under TCA §§ 39–2405 and 39–2406 "is death by electrocution, or if the jury are of the opinion that there were mitigating circumstances, the jury may fix the punishment at imprisonment in the penitentiary of the state for life, or to not more than a definite period of time over twenty (20) years," the jury assessed Jones' punishment at imprisonment in the penitentiary for 21 years and Burford's at 30 years and one day in the penitentiary. Both defendants prayed and were granted an appeal in the nature of a writ of error to this Court.

It is appropriate to mention at the outset that the trial judge charged the punishment for first degree murder prescribed by the mentioned statutes before TCA § 39–2405 was changed by Chapter 462 of the Acts of 1974 and before TCA § 39–2406 was changed by Chapter 192 of the Acts of 1973 and Chapter 462 of the Acts of 1974.

Burford's first Assignment of Error advances the insistence urged in his motion for a new trial that the evidence preponderated against the verdict of the jury. Both defendants elected not to testify and presented no evidence.

In summary, the evidence shows that some time after dark on January 25, 1973, while the defendants were engaged in the armed robbery of the Red-E-Stop Market in Nashville, the deceased, Deward Aines—a man 46 years old, entered the store and Burford told him to stop and then told Jones to get his wallet and during the process of robbing the deceased Burford shot him between the eyes with a .25 caliber automatic pistol, killing him instantly.

The investigating officer found a spent .25 caliber cartridge case in the store, and it was stipulated that the county medical examiner removed a .25 caliber slug from the back of the deceased's head.

Jones voluntarily surrendered to the police three days later. Burford fled to Providence, Rhode Island, waived extradition and was returned to Nashville. When Jones went to the police station, accompanied by his grandmother and his brother, he told the investigating officer he wanted to tell him what happened and proceeded to give a detailed account of the robbery of the store by him and Burford and the latter's shooting the deceased while they robbed him when he entered the store. He also said that he decided to give himself up and tell the truth about it after talking with his grandmother and other members of his family. His *Bruton*-expurgated statement was read to the jury without defense objection.

In his statement Jones said that he went into the store and picked up a package of cookies and went to the check-out counter and told the Negro man present to lie down on the floor and he did so, and told the lady cashier to sit down on a stool and she took the bills out of the register and put them on the counter, and "I picked the bills up and put them into a paper sack"; that a white man entered and asked 'What's going on?' as he neared the cashier; that "I took the white man's billfold out of his back pocket. It had about seven dollars in it. I threw the billfold away somewhere in the Edgehill Projects. I was getting ready to leave and the white man kept mouthing. I couldn't understand what he said . . . what he was saying. I heard the shot. I saw the fire come out of the end of the gun and the white man put his hands up to his face. I saw the blood on the white man's face as he fell to the floor. I still had the paper sack with the money in it and I ran out of the door and went up to Edgehill Village. George Compton took me to 1112 Stainback Avenue. I stayed there all night."

Burford also gave a custodial statement after his return to Nashville and after being fully advised of his constitutional rights which he acknowledged he understood and waived his right to the presence of counsel. In that statement, also read to the jury without defense objection after it was abridged to eliminate all reference to the defendant Jones, Burford made a full confession. He said he put a cartridge in the

chamber of the .25 automatic pistol and pulled the safety off before entering the store "because I thought I would have to use the gun when I went inside to rob it"; that he pulled the gun and ordered the Negro man behind the counter to lie down on the floor and told the lady at the cash register to put the money (about $92) in a paper bag and that "I took a key and opened a case and took a watch"; and that when a "real tall and heavy" white man entered the store, "I came out from behind the counter, pointed the gun on the white man and, when I got almost up to him, I said, 'Give me your car keys.' He never answered me. The white man kept saying, 'What's going on here?' I kept telling him to shut up. He wouldn't, so I shot him." He said his mother lived at 1112 Stainback Avenue and George Compton took him there later that night.

The Negro "sack boy" testified he was lying on the floor (as Jones said he told him to do and as Burford said he ordered him to do at gunpoint) and that he did not actually see the robbery or anything else that occurred but heard one shot, and that he could not identify either of the defendants and did not know if either of them was in the store at that time.

The cashier testified two Negroes came in and looked around the store; that one of them came to the counter with a box of cookies, and while she was looking for the price on the cookie box the other one came behind the counter where she was and put a gun to her side and told her this was a holdup and to remain on the stool where she was sitting, and told the sack boy to lie down on the floor; that two teen-age Negro boys came in and the robber with the gun ordered them to keep walking toward the back of the store and not to turn around, and they did so; that when the deceased entered the store, the robber with the gun told her to get next to the cash register and pretend to be making change and told the deceased to stop and told the other robber to get the man's wallet; that this other robber, the one wo had put the cookies on the counter, went over to the deceased and then the robber with the gun also approached him; that she heard a shot and the deceased fell to the floor; and that she did not see which of the robbers shot the man, and that she could not identify either of them.

Dewayne Leroy Jones, 15 years old and no relation to the defendant Jones, testified that when he arrived home a few minutes after the robbery and homicide his older brother James and the defendants were there; that Burford told him, in the presence of others, that he had gotten nervous and shot a man at the Red-E-Stop Market and asked him to keep the gun, which he refused to do; that he saw some money in a paper sack on the kitchen table and also a billfold; that the defendant Jones told him the billfold came from the man who was shot and asked him to dispose of it and the black trench coat Jones was wearing, and he threw both items into a Dempster Dumpster, which had been emptied by the time he took a police detective to that garbage receptacle.

Bobby Gordon, age 20, testified that after this occurrence he sat in a parked automobile at his home with the defendants and the car owner and Willie Jones; that the defendants were carrying a paper sack with money in it and were talking about the incident; that Burford said they went to the Red-E-Stop Market and told the woman behind the cash register "to stick em up" and that they were going to get all of her money, and after she put the money in the paper sack the man come in the store, and that he (Burford) said he turned around and dropped the gun and it went off and hit the man; that both defendants said it was an accident; and that they left with George Compton in his car.

William Jones, 20-year-old brother of 16-year-old defendant Jones, testified he saw the defendants in a car parked at Gordon's

house the night of this tragedy; that Burford told them he had robbed the store, and that his gun had gone off and he had shot a man; that the defendant Jones had a sack of change which he took out of his pocket and showed to the people in the car but said nothing about it, and that Burford showed them some bills; and that George Compton, cousin of the Jones boys, drove up and his brother asked Compton to take them "out on Stainback" and both the defendants left with Compton; that Burford lived on Stainback; and that on the following Sunday night he and his grandmother and the defendant went to the police station where the defendant voluntarily turned himself in and gave a statement to the investigating officer.

George Compton testified he saw the defendants at Gordon's house between 11:00 and 11:30 the night of this crime and took them to the Stainback area of east Nashville.

A fingerprint expert with the Tennessee Bureau of Criminal Identification testified that on the box of cookies heretofore mentioned and admitted in evidence, he found two latent fingerprints which he determined by comparison with the known fingerprints of Burford, were made by his right index finger and his right thumb, and by the same process he identified another fingerprint found on the cookie box as having been made by the defendant Jones' right thumb. Enlarged photographs of all the prints were admitted in evidence and examined by the jury without defense objection.

■ Jones has filed no Assignments of Error or brief. However, the foregoing review of the material evidence leaves no doubt that it abundantly justified and sustained the jury's verdict of guilt both as to him and Burford. Thus, Jones' challenge to the sufficiency of the evidence raised in his new trial motion, and Burford's like insistence urged in his first Assignment of Er-

ror, must be tested by the time-honored rules governing appellate review of the evidence in criminal cases. *Webster v. State,* 1 Tenn.Cr.App. 1, 425 S.W.2d 799; *McGill v. State,* 4 Tenn.Cr.App. 710, 475 S.W.2d 223. So considered, manifestly the defendants' assault upon the sufficiency of the evidence must be rejected.

■ Burford's Assignment claiming that the murder statutes under which he was indicted and tried were rendered unconstitutional by the decision of the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, is wholly untenable. In *Bowen v. State* (Tenn.S.Ct.), 488 S.W.2d 373, the Supreme Court of this State very correctly held that *Furman* merely prohibited imposition of the death penalty. Plainly, the *Furman* decision outlawing capital punishment did not invalidate our statutes proscribing first degree murder. And, equally without merit, is Burford's claim that his sentence is excessive.

■ Jones' second and final insistence urged in his new trial motion that the court erred in further instructing the jury regarding the sentence it should impose after the jury first reported that they had assessed his punishment at 20 years in the penitentiary, is unfounded. When that occurred, the court properly instructed the jury: "Well, you will need to go back and arrive at a verdict for Steven Lamar Jones in keeping with the provision, you come down to some sentence over twenty years. So, go back upstairs and talk it over and see what you can come up with." Upon further consideration, the jury again reported they found Jones guilty of first degree murder and fixed his punishment at 21 years in the penitentiary. As mentioned at the outset, the minimum punishment for first degree murder at the time of the defendants' offense and indictment was some period "over twenty (20) years" to be fixed by the jury. TCA §§ 39–2405 and 39–2406. Of course, if the court had allowed Jones' punishment to

stand at 20 years as the jury first reported, which was less than the statutory minimum, the verdict as to him would have been void. And no valid judgment could have been pronounced against him. *Daniels v. State,* 176 Tenn. 181, 140 S.W.2d 148; *Mayfield v. State,* 101 Tenn. 673, 49 S.W. 742; *Jenkins v. State* (Tenn.Crim.App.), 509 S.W.2d 240.

It is the duty of the trial court to require the jury to amend an imperfect verdict, including assessment of legal punishment. *Jenkins v. State, supra.*

Affirmed.

WALKER, P. J., and O'BRIEN, J., concur.