**STATE of Tennessee, Petitioner,**

v.

**Clyde LaCHANCE, Respondent.**

Supreme Court of Tennessee.

June 16, 1975.

---

R. A. Ashley, Jr., Atty. Gen., Bart C. Durham, Asst. Atty. Gen., Nashville, Richard A. Fisher, Dist. Atty. Gen., Cleveland, for petitioner.

Robert W. Varnell, Jr., Elliott, Goode, Jenne & Varnell, Cleveland, for respondent.

## OPINION

HENRY, Justice.

Respondent, Clyde LaChance, was convicted in the Law Court at Ducktown of murder in the first degree and sentenced to ninety-nine years and one day in the State Penitentiary. The Court of Criminal Appeals, in a divided opinion, reduced the grade of the crime to second degree murder and fixed his punishment at the statutory minimum of ten years, provided the State indicated its consent. Absent the incoming of the State's consent the judgment would be reversed and the case remanded for a new trial pursuant to *Forsha v. State*, 183 Tenn. 604, 194 S.W.2d 463 (1946). The State assented to the reduction subject to the action of this Court, and both the State and the defendant petitioned for certiorari. We granted the State's petition and have heard oral argument.

### I.

We are solely concerned with the degree of the murder and, therefore, a review and analysis of the evidence in support of the conviction has been made.

We entered upon this analysis confronted with respondent's confession that he killed his eight year old stepdaughter and buried her body in a shallow grave in the front yard near the doghouse. That this was a reprehensible, loathsome, barbarous, repulsive and abominable crime, there can be no reasonable doubt. As found by the Court of Criminal Appeals:

(T)his record demonstrates an habitual course of conduct, a pattern of horrible abuse of the children by this defendant,

unconscionable beatings similar to the one that resulted in Kimberly's death.

We concur in this finding and, because of this concurrence we find it unnecessary to give the details of other attacks upon Kimberly, and her six year old brother, with belts, boards, boots, and fists. We confine our comments to the events of the night Kimberly was killed. There are three versions which we briefly outline in ascending order of their savagery.

## A.

### Defendant's first confession

On March 30, 1972, as an aftermath of a brutal attack upon his stepchild, Scott (resulting in his hospitalization), the defendant was questioned in Des Plaines, Illinois. He admitted that on January 1, 1972, at about three o'clock a. m., when he arrived at his home in Polk County, Tennessee, the following ensued:

> . . . I tried to get Kimberly, my eight year old daughter to get off the floor and onto the bed where she belonged. She did not move, so *I hit her about four times.* She did not move, and I tried to get her to move, but she would not, after I hit her on the head with my hands. I do not remember if I closed my fist or not. I took Kim and put her on the sofa, so that it would appear as though she was sleeping. Before dawn I took Kim and *buried her in the front yard near the small doghouse.* I dug a shallow grave with a shovel . . . When I hit Kimberly *I did not mean to do any harm to her.* I just *lost my temper* and *I am sure I killed her* by hitting her but I did not mean to do it. (emphasis supplied).

## B.

### Defendant's second confession

The defendant gave a more detailed statement, in question and answer form, later that same day to officials of Cook County, Illinois.

In this statement he admitted that he "hit her too hard". When he was asked how many times, he responded "I don't know, three or four, or a dozen times, I don't know." After he had buried her, he, his wife and the other children rode around for a while and he had a few beers.

He did not tell his wife, the child's mother about killing her. Instead he told her that he had lost her at a shopping center in Chattanooga and had reported her missing.

About a week later he left Tennessee and, after brief stops in various localities, wound up in Illinois.

## C.

### The version of Brian Dean LaChance

Brian was the eleven year old stepson of defendant, and brother of Kimberly. He testified as a witness for the State.

We extract his testimony as follows:

Q. All right. Let's move up to January the 1st, or December the 31st around in there, and you recall that night, don't you?

A. I think so.

Q. Now, tell the jury what you observed happen in your home that evening?

A. Well, they were getting hit and everything like that.

Q. Who was getting hit?

A. My sister and brother.

Q. Now, you are talking about Kim and Scott.

A. Yes.

Q. How were they getting hit?

A. Sometimes he would take his boots and sometimes—

Q. How else would he hit them?

A. Sometimes with his fists.

Q. Was this all over one period of time, continuous period of time.

A. I don't know what you mean.

Q. That night, did all this happen that night, the boot and the fist you are telling about?

A. Yeah.

Q. And on Scott and on Kim.

A. Yes.

Q. How long did this last?

A. I can't remember.

Q. Was it just a few minutes?

A. No.

Q. Was it several hours?

A. Probably.

Q. All right. Do you know why he was punishing Kim?

A. He caught them playing when they weren't suppose to.

Q. Okay. Now, where was your mother during this period of time?

A. In the front room.

Q. Is that where this was taking place, in the front room?

A. No.

Q. Where did this take place?

A. In our bedroom.

Q. Did all of it take place in your bedroom?

A. No.

Q. Some of it took place in the front room too?

A. No, not that I can remember.

Q. Do you recall whether or not, was your sister crying and screaming?

A. Yes.

Q. Do you recall that she stopped her crying and screaming?

A. Yes.

Q. And do you recall what was said when the noise stopped by either Clyde or Donna?

A. Well, my mom was going in the bathroom, I don't know what, and she looked over at my sister and said, 'Sonny, come here and look at this.' He picked her up and put her on the couch and said, 'Oh, my God, what did I do?'

 \* \* \* \* \* \*

Q. Now, the occasion that Mr. Fisher has asked you about that Kimberly was hurt did your stepfather punish her for a while and then stop and come back later and start again?

A. Yes, Sir.

Q. So there were times that he would leave the room and nothing would go on and then he would come back later.

A. Yes, Sir.

Q. So when Mr. Fisher asked you if this went on for two hours it went on for a few minutes and then stopped and a few minutes and stop.

A. Yes, Sir.

Q. It wasn't two hours continuously.

A. That's right.

 \* \* \* \* \* \*

In response to a question by the Court:

A. Well, when I was in bed my sister was standing right next to the bed and he knocked her down and she didn't get up and he—

THE COURT: How did he knock her down?

A. He went—

THE COURT: With his fist?

A. Yes, Sir. And when she didn't get up he said 'Either you get up or we will start all over again tomorrow.'

The jury could have accepted all or any part of this testimony.

Additionally it should be pointed out that an autopsy was performed, and the proof showed that there was a "large amount of free, dark black blood, free in the (abdominal) cavity", and that this resulted from trauma.

On Thursday following the murder of Kimberly, a Polk County Deputy Sheriff came to the residence of defendant, accom-

panied by a welfare worker and, upon their arrival defendant fled. That night the sureties on his bond surrendered him to Polk County authorities pursuant to a charge of abusing his stepchild, Scott. The next day he was released on bond, took the remainder of his family and fled the realm, but leaving Kimberly, of course, buried in the shallow grave by the doghouse. In his haste, he left behind all his worldly possessions, including food, clothing and even suitcases. It will be borne in mind that at that time he was not even under investigation for Kimberly's death. As observed in the Book of Proverbs, "the wicked flee when no man pursueth."

On this state of facts and a record which showed a persistent pattern of abusive conduct toward these children, particularly Scott and Kimberly, and in the face of threats made toward them, the Court of Criminal Appeals held that "the evidence wholly fails to establish that this defendant intended to kill his little adopted daughter."

Judge John Mitchell, in a vigorous dissenting opinion, stated:

> The continuous beating which the defendant gave the little stepdaughter, with his hands and with his boots did in fact bring about the death of Kimberly. He literally beat her to death.
>
> I think the jury in finding premeditation, had a right to look to the evidence of intermittent and prolonged beating of the victim and to consider the callous disposition of the corpse. They could look to the defendant's efforts to hide the body and cover up the atrocious crime. To his flight from the jurisdiction and his planning the false explanation about the disappearance of the little girl while her frail lifeless body was lying in a shallow grave prepared by the defendant.
>
>   * *  * *  * *
>
> The elements of premeditation and deliberation may be inferred from the circumstances of the killing and whether pre-

meditation is present in a given case is a question of fact for the jury to determine from all the circumstances in the evidence. *Edwards v. State*, 221 Tenn. 60, 424 S.W.2d 783; *McGill v. State* [4], Tenn. Crim.App. [710], 475 S.W.2d 223; *Cagle v. State* [Tenn.Crim.App.], 507 S.W.2d 121.

We concur in these comments by Judge Mitchell.

In summary, this record shows:

a. a series of brutal assaults by a thirty-two year old man upon a defenseless child, resulting in her death;

b. this assault followed other assaults and threats extending over a long period, primarily directed toward this child and her brother;

c. the concealment of the body by its burial in a shallow grave out in the yard by the doghouse;

d. a flight to avoid prosecution.

### II.

To hold that tis record does not establish premeditation is to ignore the entire course of conduct of this defendant. Broadly speaking we are not confronted with a case of whether this defendant intended to kill, but rather with which child he would ultimately destroy and when. We deal with a malignancy of mind, a depraved intent, and a pattern of criminal conduct, all of which add up to premeditation.

■ We think that the intent to kill may be inferred from the brutality of the attack. *People v. Martina*, 140 Cal.App.2d 17, 294 P.2d 1015 (1956).

As phrased by the New Jersey Court in *State v. Van Duyne*, 43 N.J. 369, 204 A.2d 841, 11 A.L.R.2d 1086, cert. denied 380 U.S. 987, 85 S.Ct. 1359, 14 L.Ed.2d 279 (1965), in a case wherein the defendant had beaten his wife to death with his fists:

(T)he succession of blows, the patently vicious manner of their infliction, the

**938**

enormity of the cruelty and the horrendous injuries suffered provide further evidence of a wilful execution of an intent to kill. 204 A.2d at 846

The intent to kill may be inferred from an assault with the fist of the hands where there is a great disparity in physical strength and ability as between assailant and victim. 40 Am.Jur. (Second) Homicide, Sec. 268 (1968), citing *Sadler v. State*, 364 S.W.2d 234 (Tex.Crim.1963), where the assault was made upon a sickly girl by an ex-boxer and strongman, and *Hignett v. State*, 170 Tex.Cr.R. 342, 341 S.W.2d 166 (1960), where a 3 months old child was beaten by her father. See also *Finch v. State*, 98 Ga.App. 480, 106 S.E.2d 86 (1958), wherein two men of superior strength attacked and severely injured a paralytic, and *Corbin v. State*, 250 Ind. 147, 234 N.E.2d 261, 237 N.E.2d 376 (1968), wherein the Court holds that an intent to kill may be inferred, particularly, in view of relative size, age and strength of defendant and victim, and that the act of a powerful defendant who continues to beat a victim who is smaller and helpless shows intent to kill.

In *McGill v. State*, 4 Tenn.Cr.App. 710, 475 S.W.2d 223 (1972) the Court said:

> Concerning the weight and sufficiency of evidence to establish premeditation, and particularly with reference to the nature of the act causing death, many courts have held that deliberation and premeditation may be inferred from the manner in which the killing was committed; and that repeated shots, blows, and other acts of violence are sufficient evidence of premeditation. Id. at 227–228

Evidence of a series of deliberate assaults upon a child demonstrates the necessary intent, premeditation and wilfulness. *People v. Kinzell*, 106 Ill.App.2d 349, 245 N.E.2d 319 (1969).

It is firmly established that the existence of premeditation is a question of fact to be determined by the jury from all the circumstances of the killing. *Edwards v. State, supra ; McGill v. State, supra.*

We do not wish to be understood as holding that the concealment of the body, standing alone, is sufficient to establish premeditation. We believe the proper rule to be that this goes to the matter of guilt as opposed to the degree of the crime, or phrasing it another way, an inference of guilt may be drawn from concealment or destruction of the body. *Cagle v. State, supra.* Under the rule of *Mullendore v. State*, 183 Tenn. 53, 191 S.W.2d 149 (1945), the concealment of the body is a circumstance to be considered on premeditation. Nor do we hold that flight, standing alone, after a crime has any bearing upon the question of premeditation.

Under the totality of the evidence we hold that the jury was justified in finding that the defendant was guilty of murder in the first degree and that the trial judge properly approved the question of premeditation.

We, therefore, reverse the judgment of the Court of Criminal Appeals and affirm the trial court.

FONES, C. J., and COOPER, BROCK and HARBISON, JJ., concurring.