# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 11, 2001

## STATE OF TENNESSEE v. CHARLES E. JONES

**Appeal as of Right from the Criminal Court of Shelby County
No. 98-10037  James C. Beasely, Jr., Judge**

---

**No. W2000-02606-CCA-R3-CD  - Filed November 2, 2001**

---

The appellant, Charles E. Jones, was convicted by a jury in the Shelby County Criminal Court of first degree murder and was sentenced to life imprisonment in the Tennessee Department of Correction. On appeal, the appellant contends that the evidence is not sufficient for a jury to find him guilty of first degree murder.  Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

A.C. Wharton, Jr., Garland Ergüden, Trent Hall, and Robert Parris, Memphis Tennessee, for the appellant, Charles E. Jones.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Paul Goodman and Paula Wulff, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I.  Factual Background

On May 29, 1998, Officer Jeff Dennison of the Memphis Police Department was on patrol when he was flagged down by Hubert Sturdivant.  Sturdivant advised Officer Dennison that there was a dead body in Sturdivant's house at 1357 Taylor Street in Memphis.  Officer Dennison immediately radioed for assistance and was followed to the scene by Officer Stephen Thaggard.  When the officers arrived at the scene, they saw broken glass on the steps and porch of the house.  As the officers stepped onto the front porch, the door opened and the appellant stood in the doorway.

When the appellant opened the door, the officers were able to see a dead body rolled up in carpet lying on the living room floor.  Officer Dennison immediately ordered the appellant to get down, then handcuffed him, and placed him in the back of Officer Thaggard's car.  Both officers

observed that the appellant was calm during the entire episode and never appeared to be upset. The appellant had scratches on his neck, blood splatters on his left ear, a scratch on his check, blood splatters in his hair, and a cut on his finger.

Officer Thaggard proceeded into the house. He testified at trial that the victim's bloody head was sticking out of the carpet. He saw blood splatters in the living room, on the shades, on the floor, "everywhere--it's blood everywhere." In the dining area, he saw blood on the floor and marks on the floor that indicated that something had been dragged across the area. Next to the victim's body, Officer Thaggard discovered a bucket of soapy water with a rag in it. He noted that the water was red, as if discolored by blood. A garbage can in the room contained broken glass and blood.

The appellant was taken from the scene to the Regional Medical Center (Med) for examination and treatment. Captain Joseph Eldridge of the Memphis Police Department interviewed the appellant at the Med. Captain Eldridge recounted that he advised the appellant of his Miranda rights and asked the appellant if he wanted to give a statement. The appellant answered affirmatively and responded that he had killed the victim because she had "disrespected" him and knocked his crack pipe out of his hand. Captain Eldridge did not reduce this statement to writing.

The appellant was taken from the Med to the Criminal Justice Center. After again being advised of his rights, the appellant gave a written statement. The appellant related that he met the victim when he "went to the dope house" to buy crack cocaine. After purchasing the crack cocaine, the appellant went to a store up the street and purchased beer and cigarettes. The victim, who was standing in the parking lot of the store, began following the appellant. The appellant invited her to accompany him to his house. When they arrived at his house, the two drank beer and smoked "$50 dollars worth of crack." After smoking crack cocaine, the appellant asked the victim to have sex with him. The victim agreed and removed her clothes. Later, the victim became angry when the appellant refused to give her more crack cocaine. According to the appellant, the victim knocked a crack pipe from the appellant's hand and they "got to wrestling."

The appellant alleged that the victim had a box cutter, which she began swinging at him, and cut him on the finger. The appellant insisted that he cut the victim only three times in an effort to defend himself. He admitted that during their struggle, the victim was unclothed. He claimed that, after being cut, the victim attempted to jump through a window. However, there were bars on the window and she was unable to escape. He contended that the glass from the broken window caused most of the victim's injuries.

When the struggle ended, the appellant claimed that he panicked and did not know what to do with the victim. He taped the victim's ankles and wrists together and placed a garbage bag on the upper portion of her body. He then rolled the body inside a piece of carpet. Attempting to clean up the blood, he placed the victim's clothes, his clothes, a wig, and the broken glass in a garbage bag. He then walked out onto his porch and smoked a cigarette.

-2-

The appellant admitted that he did not call for medical assistance for the victim or call the police. He did not know the victim's name and explained that he had never met her before the day of the incident.

Dr. O'Brian Cleary Smith, the Shelby County medical examiner, testified that the autopsy of the victim revealed eighty-three separate wounds on the victim's body. He described approximately sixty-eight stab and incised wounds to the head, neck, torso, and extremities, opining that seven of the wounds were fatal. The primary causes of death were: a stab wound through the esophagus; a stab wound through the left jugular vein; a stab wound through the subclavicula vein; a stab wound to the right lung; a stab wound involving tissues of the center of the chest; a stab wound to the left lung; and a stab wound to the back. He concluded that the wounds were consistent with injuries from a box cutter, although he acknowledged that some of the wounds could have been caused by broken glass. However, no glass was found in any of the victim's wounds. Additionally, Dr. Smith reported that the appellant's blood was tested for the presence of cocaine. Dr. Smith related that a result of .1 or .2 micrograms of cocaine per milliliter is considered normal street level usage. The appellant's test results showed a level of .13 micrograms per milliliter.

At the conclusion of the trial, the jury found the appellant guilty of first degree murder. The trial court sentenced the appellant to life imprisonment in the Tennessee Department of Correction.

## II. Analysis

The appellant challenges the sufficiency of the evidence underlying his conviction of first degree murder. In order to prevail, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). All factual issues raised by the evidence, including questions concerning the credibility of witnesses and the weight and value to be given the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). These standards apply to convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000), cert. denied, __ U.S. __, 121 S. Ct. 2600 (2001); State v. Vann, 976 S.W.2d 93, 111-112 (Tenn. 1998) (appendix). Thus, as in the case of direct evidence, the weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal appellant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-106 (Tenn. 1999).

At trial, the State must prove all elements of first degree murder, including premeditation, beyond a reasonable doubt. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). Premeditation requires "the exercise of reflection and judgment," Tenn. Code Ann. § 39-13-202(d) (2000 Supp.), and a "previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citing McGill v. State, 475 S.W.2d 223, 227 (1971)). Notably, the intent to kill does not have to pre-exist for any definite period of time. State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD, 2000 WL 298901, at *7 (Tenn. Crim. App. at Jackson, March 14, 2000), aff'd, State v. Sims, 45 S.W.3d 1, 20 (Tenn.), Cert. denied, _US_, _S Ct_ (2001).

Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-42, and West, 844 S.W.2d at 148); State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

A jury, upon consideration of the facts adduced at trial in this case, could conclude beyond a reasonable doubt that the appellant premeditated killing the victim. In this written statement, the appellant described the events in detail:

Then when she started to act crazy after I wouldn't give her any more dope, then she smacked the crack pipe out of my hand, and the crack hit the floor. I was sitting on the floor and she was sitting in the chair. I pushed her out of the chair for knocking the crack on the floor. That's when she pulled up a box cutter and went to swing at me, cutting me on my finger. Me defending myself, we got to wrestling with one another. I was able to get the box cutter from her. That's when she started scratching on me. That's when I took charge and picked the box cutter up and cut her once. She ran for the door; the door was locked, so she ran and tried to jump out the window not realizing the bars were on it. I had the door keys in my pocket, and the door had a deadbolt lock on it. After she ran into the window, I could see glass from the window sticking in her. Then I asked her if she was alright, and she grabbed me again and we got to tussling. I picked up the box cutter again and cut her to get her off me. She throwed the glass her beer was in at me. She hit me in the side with it. After that, she ran toward the other window hollering for help and broke the glass trying to get out. Me getting frustrated, I got the box cutter again; that's when she fell to the floor bleeding.

Dr. Smith testified that the victim had a total of eighty-three separate wounds, seven of which were sufficient to cause death. Additionally, Dr. Smith testified that the wounds were of varying types, including "flick marks" which he described as "where the tip of the knife can be buried under the skin surface and then twisted out."

After the appellant killed the victim, he attempted to conceal his crime. The appellant admitted that he taped the victim's ankles and wrists together, placed a garbage bag over the upper portion of her body, and rolled her body inside a piece of carpet. He then attempted to wash the blood from the area and clean up the broken glass and bloody clothes. The appellant stated that, following these actions, he walked out on his porch and smoked a cigarette. Officer Thaggard and Captain Eldridge described the appellant's demeanor as calm, specifically noting that the appellant never appeared to be upset.

The appellant claims that he killed the victim in self-defense; therefore, the appellant argues, his use of force was justified. See Tenn. Code Ann. § 39-11-611(a) (1997). If evidence is introduced supporting self-defense, the burden is on the State to prove beyond a reasonable doubt that the appellant did not act in self-defense. See Tenn. Code Ann. § 39-11-201(a)(3) (1997). However, whether an appellant acted in self-defense is a factual determination to be made by the jury. State v. Goode, 956 S.W.2d 521, 522 (Tenn. Crim. App. 1997). Although the trial court properly charged self-defense to the jury, the jury clearly rejected this defense. The appellant admitted to investigators that he killed the victim because she "disrespected" him. As noted, the victim had more than eighty-three wounds, all inflicted while she was unclothed. The appellant admitted that the victim unsuccessfully attempted to escape. The trial court correctly observed that the nature and number of the injuries indicate that this murder did not occur quickly. The jury had ample evidence from which it could conclude that the appellant did not act in self-defense. We cannot second-guess the jury in light of the evidence.

## II. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-5-