IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 16, 2008

## STATE OF TENNESSEE v. TIMOTHY TYLUS SORRELLS

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 259840    Don W. Poole, Judge**

_____

**No. E2008-00791-CCA-R3-CD - Filed November 5, 2009**

_____

Following a jury trial, Defendant, Timothy Tylus Sorrells, was convicted of first degree premeditated murder and abuse of a corpse. Defendant was sentenced to life imprisonment with the possibility of parole for his murder conviction and one year as a Range I offender for abuse of a corpse, to be served concurrently. On appeal, Defendant argues that the evidence is insufficient to support his convictions. Following our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, Timothy Tylus Sorrells.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William H. Cox, District Attorney General; and Neal Pinkston, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

On May 23, 2006, around 11:00 p.m., Officer Zachary Fuller and other officers of the Chattanooga Police Department responded to a call at the Fast Food and Fuel business located at 2727 Rossville Boulevard in Chattanooga regarding a prostitute that had gotten into the car with two males. When the officers arrived at the scene, a prostitute was there and told them that she knew where to find a dead body. She rode in the back of Officer Fuller's patrol car and directed him to the dead end of Asbury Park Drive. Officer Fuller found the body of an African American woman lying under a pallet. He did not disturb anything and notified the major crimes unit. A day or two before the body was discovered, Officer Fuller and other officers had been briefed on a missing person by the name of Virginia Knight.

Bridget McCurty testified that Virginia Knight, the victim, was her mother. Ms. McCurty saw the victim on May 20, 2006, at McCurty's daughter's high school graduation. After graduation, the family, including the victim, went to Ms. McCurty's house on Talladega Avenue where they sat around and talked. The victim later left and mentioned that she was going to James Cordell's house. Ms. McCurty testified that she last saw the victim around 8:15 to 8:30 the next morning, May 21, 2006, in front of Mr. Cordell's residence. It appeared that she had been drinking. The victim was supposed to be at Ms. McCurty's home later that evening, but she never arrived.

On the evening of May 21, 2006, Ms. McCurty received a call from James Cordell, who told her that the victim had left with someone named "Tim," and he was worried because they had not returned. She said that Cordell called several other times during the evening of May 21, 2006, and the early morning hours of May 22, 2006. Her friend, Leonard Lane, answered the calls. At some point, Lane left to go to Mr. Cordell's house to look for the victim's car. Ms. McCurty testified that Lane returned home, and they later went out looking for the victim but did not find her. Several people told them that they had seen the victim and Defendant together, and one person saw the victim with Defendant and a white male. Ms. McCurty eventually filed a missing person's report. She later received a call that the victim's body had been found.

Officer Dennis Pedigo of the Chattanooga Police Department testified that he pulled Defendant over sometime after 2:00 p.m. on May 21, 2006, at the intersection of Dodds Avenue and Bailey Avenue. Defendant had an unopened twelve-pack of beer in the back floorboard. Officer Pedigo testified that there was a black female passenger in the vehicle, and she told Officer Pedigo that the car belonged to her.

Brenda Allen testified that she went to James Cordell's house after work on the night of May 21, 2006. She arrived sometime between 10:00 and 11:00 p.m., and Mr. Cordell and "Tina" were the only two people there. Ms. Allen testified that Defendant stopped by the house around 1:00 a.m. on May 22, 2006, and said that he had returned the victim's car and keys. The victim was not with him. She said Defendant remained at the residence for a while, and a white male showed up at the door. He and Defendant got into an altercation, and the man left. Mr. Cordell then telephoned the victim's daughter's house and spoke with Leonard Lane. While Lane was on the phone, Defendant spoke to him and said that the victim had gotten into an eighteen-wheeler at the Fast Track gas station, and he had to sit in the car and wait for her to return. Defendant said that he got tired of waiting and brought the victim's car and keys to Cordell. He also said something about getting a ticket.

Ms. Allen testified that she, Defendant, Mr. Cordell, and Tina later got into the victim's car and drove to the gas station on Third Street to buy gas, ice, and cigarettes. They arrived back at Mr. Cordell's residence twenty minutes later, and Defendant remained at the residence for a couple of hours. He then left and returned one and one-half to two hours later and said that the victim was dead. Ms. Allen testified that Defendant appeared to be very upset, and he said that he could take them to the victim's body. Defendant pulled his shirt off and then put it back on. Defendant was at the residence for approximately fifteen minutes, and Mr. Cordell told him to leave and call police. Defendant returned around twenty minutes later and said that he had called police and that they were on the scene. Defendant then left Cordell's house again by walking away.

Leonard Lane testified that he received several calls during the early morning hours of May 22, 2006. He said that James Cordell called more than once, and he also spoke with Defendant who said "something about her being with a guy in an 18-wheeler." Defendant sounded highly upset. He also said, "I ain't done sh** to that lady." Mr. Lane went to Mr. Cordell's residence around 6:30 to 7:00 a.m., and he, Ms. Allen, and Mr. Cordell went looking for Defendant, but they were unable to find him or the victim.

Detective Joe Shaw of the Major Crimes Division, Missing Persons Unit, testified that he worked on the victim's case with Detective Jeff Dean. On May 22, 2006, he assisted Detective Dean with interviewing Defendant. At the time, the victim's body had not been found. Defendant was very calm and said that he was unaware of the victim's whereabouts. He also denied a sexual relationship with her. On the evening of May 24, 2006, Detective Shaw was present when Defendant was located at Kanku's service station and taken into custody. Investigator James Tate was also present. The victim's body had been found the previous day. Detective Shaw testified that a female officer arrived to transport Defendant, and Detective Shaw rode in the patrol car with them. Defendant began yelling, cursing, and kicking the door frame of the car. The female officer pulled over, got out of the patrol car, and a male officer took her place. Once the female officer got out the car, Defendant calmed down. Defendant was then taken to the police service center and formally arrested.

Investigator Steve Wiertel of the crime scene unit testified that on the evening of May 22, 2006, he collected clothing and DNA from Defendant. He also took photographs. Defendant's shirt was turned inside out when Investigator Wiertel took it. He then turned all of the evidence over to Investigator Greg Mardis.

Investigator Greg Mardis of the crime scene unit testified that on the morning of May 22, 2006, he was dispatched to 1213 East Thirteenth Street. He talked with Detective Dean and photographed the location. He also looked over the victim's car and saw stains on the back seat that appeared to be dried blood. The victim's purse was on the front right floorboard of the vehicle. Investigator Mardis testified that the car was then towed to the crime scene unit processing bay. He collected samples from the seat cover that tested positive for blood. The samples were then sent to the Tennessee Bureau of Investigation (TBI) for further testing.

On May 23, 2006, Investigator Mardis responded to the crime scene at Asbury Park. The area appeared to be a local illegal trash dump. He saw the victim's body with a pallet and board on top of her. Near the body, he found a pair of women's underwear and blue jean shorts. Investigator Mardis and other officers removed the pallet and board from the top of the victim's body. She was lying face down and wearing only a white shirt. Based on the insect activity, Investigator Mardis concluded that the victim had been dead for some time. Her body was also in full rigor mortis. Investigator Mardis noticed scratch marks on the victim, and her pelvis appeared to be flattened.

Shana Mills is employed as a DNA analyst II and forensic biologist for Bode Technology in Lorton, Virginia. In 2006 and 2007, the TBI sent evidence to be processed for DNA. The items in this case were tested for the presence of blood and semen. Ms. Mills testified that blood was found on the right rear back seat cover of the victim's car and in three areas on the right rear seat cover.

Semen was detected but not confirmed in two areas on Defendant's pants. Ms. Mills testified that there were four areas of blood found on Defendant's shirt, and semen was found on the victim's vaginal and anal swabs. Blood was also indicated on a sleeveless shirt.

Sarah Shields is a DNA Analyst III and forensic biologist for Bode Technology. She tested the samples in the present case for DNA profiles. She determined that the right rear back seat cover from the victim's car contained the victim's complete DNA profile, and the rear seat cover contained a partial profile that included a male contributor. Ms. Shields testified that the DNA profiles on Defendant's shirt were consistent with both Defendant and the victim. On one area of the shirt, which contained a mixture of DNA from both Defendant and the victim, Ms. Shields determined that in the "U.S. African-American population, 99.99972 percent of the U.S. population can be excluded." Ms. Shields testified that the "sperm fraction" on the victim's vaginal swab contained Defendant's complete DNA profile, and the "sperm fraction" from the victim's rectal swab contained a partial profile consistent with Defendant. She also said that one of the blood spots on Defendant's shirt contained a "mixture" that included both a DNA profile from a second male and DNA consistent with Defendant.

The Hamilton County Medical Examiner, Dr. Frank King, performed an autopsy on the victim. He determined that the cause of death was manual strangulation. The victim also had multiple blunt force injuries consisting of contusions or bruises on both sides of the front pelvis and the right thigh, and the victim's pelvis was fractured in eight places. The fractures occurred while the victim was alive. Dr. King found contusions on the skin of the victim's right hip, left arm, left elbow, left dorsal wrist, right arm, left thigh, and left leg. There was also a bite contusion where the victim's teeth had clinched against and bitten into her tongue. The tissue on the inside of the victim's upper lip was torn because her lip had been pulled away from the gum. Dr. King testified that there was a fresh contusion on the inner wall of the victim's vagina consistent with penetration, and there were multiple hemorrhages under the victim's scalp indicating points of impact. There were also injuries to her neck. He felt that the victim would have bled from her nose, mouth, and rectum.

Dr. King found abrasions on the victim's back and right leg. The abrasions on the victim's back had a post-mortem appearance, and the patterns were consistent with her body being dragged. Dr. King testified that the pelvis is a very strong structure, and it would require an excessive amount of force, such as a traffic accident, fall from a significant height, or a very aggressive beating, to break the bones. He said that the fractures could have been caused by stomping, and the victim's injuries would have caused a significant amount of pain. Dr. King testified that the pelvic fractures and manual strangulation occurred close together. He estimated that the fractures caused a twenty-percent loss of blood volume, which took several minutes and was enough to cause death. Dr. King testified that the victim's blood contained 0.171% ethyl alcohol. He explained that bacteria from decomposition of the victim's body would cause "roughly half" of the amount of ethyl alcohol in the victim's blood. The drug screen was negative. Dr. King testified that the decomposition of the victim's body was consistent with her death occurring on May 21, 2006.

## II. Analysis

Defendant argues that there were insufficient facts and circumstances from which the jury could find beyond a reasonable doubt that he was the perpetrator of the charged offenses in this case. He further contends that the evidence was insufficient to establish premeditation with respect to his first degree murder conviction.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the state. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The identity of the perpetrator is an essential element of any crime. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). Sufficient proof of the perpetrator's identity may be established through circumstantial evidence alone. Rice, 184 S.W.3d at 662. The circumstantial evidence, however, must be not only consistent with the guilt of the accused, but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypotheses except that of guilt. State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987). In addition, "'it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime.'" Id. (quoting Pruitt v. State, 3 Tenn. Crim. App. 256, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)). "A conviction may be based entirely on circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2005) (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)).

Defendant was convicted of abuse of a corpse. A person commits this offense by knowingly physically mistreating a corpse "in a manner offensive to the sensibilities of an ordinary person" or disposing of a corpse in a manner known to be in violation of a law. T.C.A. § 39-17-312 (2006). He was also convicted of first degree premeditated murder, which is a premeditated and intentional killing of another. T.C.A. 39-13-202(a)(1). An act is premeditated if the act is done after the exercise of reflection and judgment. Id. at (d). Furthermore,

> Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the

accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The element of premeditation is a question of fact for the jury to determine based upon consideration of all of the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). Because premeditation involves the defendant's state of mind, concerning which there is often no direct evidence, Tennessee cases have long recognized that premeditation may also be proved by circumstantial evidence. State v. Davidson, 121 S.W.3d 600, 614-616 (Tenn. 2003) (citing State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992)). Our supreme court has provided a list of non-exclusive circumstances that would justify a jury in finding or inferring premeditation: the use of a deadly weapon on an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill the victim; the defendant's procurement of a weapon; preparations taken to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and the defendant's calm demeanor immediately after the killing. State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998); Bland, 958 S.W.2d at 660. A jury, however, is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment. See T.C.A. 39-13-202(d). All of the circumstances of the offense and the defendant's conduct may be considered in determining whether the act was premeditated. Davidson, 121 S.W.3d at 615 (citing State v. LaChance, 524 S.W.2d 933, 937 (Tenn. 1975)).

Viewing the evidence in a light most favorable to the State, the proof clearly established that Defendant was the perpetrator of the offenses in this case. The victim left James Cordell's residence with Defendant, and when she was last seen alive, she was with him on May 21, 2006. This was consistent with the medical examiner's testimony concerning time of death. When Defendant returned the victim's car and keys to Mr. Cordell's residence, he said that the victim had gotten into an eighteen-wheeler with someone at the Fast Track gas station. However, he later came back to the residence and said that the victim was dead and that he could take Mr. Cordell and others to her body, which was later found in an illegal trash dump with a board and pallet on top of it. The victim's blood was found on Defendant's shirt, and his semen was found on the vaginal and rectal swabs taken from the victim.

Likewise, the proof clearly established that Defendant acted with premeditation when he killed the victim. The killing in this case was particularly cruel. The victim died of manual strangulation. She also had multiple blunt force injuries and contusions, and her pelvis was fractured in eight places. The fractures occurred while the victim was alive, and the medical examiner testified that it would have required an excessive amount of force to break the bones. He said that the fractures could have been caused by stomping, and the victim's injuries would have caused a significant amount of pain. He also testified that the manual strangulation and pelvic fractures occurred close together. The victim's upper lip had been pulled away from the gum, and there were multiple hemorrhages under her scalp indicating points of impact. There was also a fresh contusion on the inner wall of the victim's vagina consistent with penetration.

There was some evidence that Defendant acted with calmness immediately after the killing. As stated above, Defendant returned the victim's car and keys to Mr. Cordell's residence and said that the victim had gotten into an eighteen-wheeler with someone at the Fast Track gas station. However, he later came back to the residence and said that the victim was dead. Although there was some testimony that Defendant was upset, Detective Joe Shaw testified that Defendant was very calm during an interview on May 22, 2006, before the victim's body was found. Defendant said that he was unaware of the victim's whereabouts, and he denied a sexual relationship with her. Defendant attempted to secrete or dispose of the victim's body by dragging it to an illegal trash dump in a secluded area on a dead-end street and placing a pallet and board on top of it.

These circumstantial facts are "so clearly interwoven and connected that the finger of guilt is pointed at the Defendant and the Defendant alone." Reid, 91 S.W.3d at 277. We conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was the perpetrator of the offenses of first degree murder and abuse of a corpse. Similarly, we conclude that Defendant acted with premeditation with respect to his first degree murder conviction.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE

-7-